## BANKS *v.* FLINT.

Decided November 8, 1890.

1. *Usury— What constitutes.*

A loan of money is usurious where it appears that the lender was to receive excessive interest, or that a bonus or commission was paid to an agent of the lender with his knowledge, or under circumstances from which his knowledge will be presumed, which commission, when added to the interest, will exceed the lawful rate.

2. *Agency—Proof of.*

Where, from a consideration of their intimate relations toward each other, of their respective business purposes and of their large and constant dealing with each other for a number of years in a uniform manner, it was apparent that it was understood between a bank and a loan company that the bank would solicit borrowers in the south and west, make the necessary examinations, and obtain the desired information as to security and borrowers, and present applications and information to the company; that the company would accept such applications to the extent of its fund, as it deemed safe; that the bank would see that the securities were properly prepared and executed, and the title to the mortgaged property perfected, and attend to the collection of notes as they matured. *Held:* The bank was the agent of the loan company, though the borrower signed an agreement which recited that the bank was his agent.

3. *Usury—Agent's commission.*

Where the loan company paid the bank nothing for negotiating the loan, it will be presumed to know that the borrower paid for such services; where the company knew the terms on which the bank habitually did business before the loan in controversy was made, it was reasonably apprised that it would be made on the same terms; where the bank's commission, in addition to the interest paid the lender, exceeded the lawful rate of interest, the loan is usurious and the security void.

APPEAL from *Yell* Circuit Court in Chancery, Dardanelle District.

G. S. CUNNINGHAM, Judge.

*John Hallum* for appellant.

The proof shows that the Corbin Banking Company, Ocobock and Hall & Carter were all the agents of the New England Mortgage Security Company, and that the banking company and security company were jointly interested in placing the loans. Ocobock is the same person who

figures in the Nebraska cases cited below. 13 Neb., 553, 556; 11 Neb., 488; 13 *id.*, 151·7; 14 *id.*, 91; 15 *id.*, 335. The acts of an agent and his knowledge, within the scope of the agency, bind the principal. Field on Corp., sec 184. 204; Story, Ag., sec. 140, 140 *a*, *b*, and notes. The security company is a delusion, a blind, a snare, to hide and cover guilty knowledge and corrupt contracts for the banking company. 13 Neb., 166. The notes are void in the hands of Ocobock, the security company or the banking company, and could gather no vitality by circulation. 41 Ark., 331. It is plain that Hall was agent of the lender. He could not *for the same purpose* be the agent of both borrower and lender. The shifting of allegiance and responsibility from lender to borrower will not be tolerated. It is simply double dealing. 100 Ill., 611; 13 Neb., 161, 551 to 556. A party making a usurious loan through an agent takes the contract subject to all the infirmities attaching to it in the hands or by the acts of an agent. 14 Neb., 91, and cases *supra ;* 13 *id.*, 157; *ib.*, 555-6; 11 *id.*, 487; 6 *id.*, 151. The loan was usurious and void.

*J. M. Rose* for appellees. *U. M. & G. B. Rose*, of counsel.

The lender only charged 8 per cent. interest, and even assuming that the Corbin Banking Company was the agent of the security company, knowledge of any illegal exaction in the way of commissions must be brought home to the lender. 51 Ark., 544. To make this loan usurious, the banking company, Ocobock, or Hall & Carter, must have been the agent of appellee. No part of the commissions went to appellee, nor did it have knowledge of any illegal exactions. It paid the full amount of the loan, and only charged legitimate interest. This does not constitute usury. *Ib.*, 544. There are two contracts in this case. One, the loan with 8 per cent. interest. The other, to pay Hall & Carter, and their associates, their commissions and fees. The first is a contract for the loan of money ; the second, a contract for services in procuring a loan of money. The first is legal, for the interest is only 8 per cent.; the second is

legal because the law prescribes no limit to charges of this kind. The charge may be excessive, but there is no evidence to that effect, and courts do not relieve against foolish contracts, in the absence of fraud or mistake. To render these two legal contracts illegal, the broker who received the commission was the agent of the lender, or the bonus was a mere device or cloak for usury. 7 S. E. Rep., 265 ; 1 So. Rep., 242; 6 *id.,* 239. The case in 32 Fed. Rep., 119 is in direct conflict with the decision of the Supreme Court of the same state. The courts follow the construction of the court of last resort of the state. 22 Ark., 125. See also 9 S. E. Rep., 1092; 114 Ill., 133; 12 Sawyer, 73; 7 S. E. Rep., 332–4.

Notice to an individual corporator, if he be not an organ of communication between the corporation and those who deal with it, is not notice to the corporation. 1 Waterman on Corp., sec. 135 ; Mechem on Agency, 730; 82 N. Y., 307; 1 Hill, 572 ; 26 Conn., 376; 10 Md., 517; 11 Vroom, 435 ; 5 Denio., 329; 41 Conn., 255 ; 44 Wisc., 342; 12 Ala., 502 ; 18 Kans., 481 ; 12 C. E. Green. N. J. Eq., 33 ; 47 Ia., 575.

*G. W. Bruce, C. W. Cox* and *E. A. Balton,* of counsel for appellant.

The question of agency is one of fact ; and the signing of a contract that a party is the borrower's agent, where all the facts and circumstances show said party to be the agent of the lender, will not avail the usurer. 32 Fed. Rep., 119 ; 46 Mich., 393 ; and the Nebraska cases.

Everything that was done was for the lender's benefit ; nothing for the borrower's. 46 Mich., 393. All the services performed in this case were for the lender, and the security company knew, or might have known, what their agents were doing. They are bound by the knowledge and acts of their agents. 9 N. W., 445; 15 Neb., 336 ; 14 N. W., 471; 15 *id.,* 726; 9 *id.,* 650 ; 12 *id.,* 916; 11 *id.,* 753; 15 *id.,* 214: 33 Conn., 81 ; 24 Minn., 269; 100 Ill., 611; 59 Ind., 93 ; 10 N. W., 698 ; 7 N. W., 275 ; 18 *id.,* 78. The Georgia cases are not sustained by reason or authority. 11 S. E., 878 ; *id.,* 881 ; 32 Fed. Rep., 119 ; 1 So. Rep., 242.

HEMINGWAY, J.   The appellee, Charles L. Flint, on the 24th of September, 1888, filed his complaint in the Yell circuit court against the appellant, Hardy M. Banks, seeking to foreclose a mortgage executed by the latter.   It was alleged in the complaint that the appellant executed the mortgage on the 16th day of February, 1883, to secure the payment of six notes executed by him on that day to the New England Mortgage Security Company, one for one thousand dollars, payable in five years, and the others payable annually, representing the interest thereon at the rate of 8 per cent. per annum.   That the two interest notes, maturing in 1884 and 1885 respectively, had been paid, and that no part of the principal or other interest notes had been paid.   The defendant admits that the facts are correctly set out in the complaint, and relies for a defense upon the plea of usury.   He also seeks the cancellation of his mortgage and notes on the same ground.   On the final hearing in the court below judgment was rendered in accordance with the prayer of the bill, and the defendant has appealed.   The errors assigned relate to the finding of facts by the court, and this requires that we review the evidence.   It is conceded that, of the $1000 represented by the principal note, $200 was retained by persons engaged in negotiating the loan, and that $800, and no more, were paid directly to Banks.   Of the $200 retained $20 went to Hall & Carter, and $180 was paid to one A. W. Ocobock, to be shared with the Corbin Banking Company.

It is obvious that if the sum thus retained was any part of the sum paid for the use of the money borrowed, excessive interest was contracted for; but if it formed no part of the sum paid for the use of money, within the meaning of the constitution, excessive interest was not contracted for. The testimony is voluminous, and, without stating it in detail, we recite the facts as they are conceded or clearly proved.

Banks was a farmer residing in Yell county.   Hall & Carter were attorneys at law, residing at Dardanelle, in said

county.  A  short  time  before the mortgage was  executed,
Banks  learned  through  an  advertisement in  a local  news-
paper that Hall & Carter " were prepared to negotiate loans
on  well-improved  farms  upon  five  years' time, in  sums  of
$300 and upwards."   He applied to them for a loan.   They
explained to him fully the terms upon which he could get a
loan, stating the rate of  interest, time that loan  would run,
security that would be required, and the amount that would
be retained by them.   He wished a loan on the terms stated,
and  they  then  caused  him  to  fill  out  an  application for a
loan on printed blanks furnished by them, setting out in full
the  character and  quantity  of the  land  and  of its improve-
ments,  the  quality  and quantity of its  annual  products, its
location—in  fact, everything  in  any way material in deter-
mining its value  as security.   The  application  concluded
with  the  statement  that  the  representations  therein  were
true, and were  intended  to  be  used  by Hall  &  Carter  as
agents for  the  applicant  in  procuring  for him  a loan.   At
the same time he  signed, at their  instance, a  printed agree-
ment, which, after  reciting  that he had  employed  them to
negotiate for him  a  loan of $1000 for  a  term of five years,
at 8 per cent. per annum, to be secured by first mortgage on
his farm, obligated him to furnish an abstract of title, to pay
the fee for recording the mortgage, and to  pay them 20 per
cent. of  the  amount obtained.   The land was  examined by
L.  C.  White,  an  examiner  engaged  by  Ocobock  for  that
place, and he filled out a blank certificate, furnished by Hall
&  Carter, setting  out  the  results  of  his  examination.   A
blank certificate was filled out by Hall &. Carter, setting out
their opinion as to the  value and  character of  the  security,
and also as to the  character of  the  applicant and  his habits
as regards the  payment of his  debts.   They also  prepared
an abstract of his title to the land offered as security.  They
then  forwarded  the  application, the  examiner's  certificate,
their  statement,  the  abstract  of  title  and  their  contract
with Banks to Ocobock at  Memphis, who forwarded all the
papers  to  the  Corbin  Banking  Company  at  No. 115  Broad-

way, New York. It presented all the papers, except the agree-
ment between Banks and Hall & Carter, to the New England
Mortgage Security Company, and solicited it to lend the
money. It, after examining the application and accompany-
ing papers, agreed to make the loan on delivery to it of the
applicant's notes and mortgage, with an abstract showing
his title perfect on the date of the mortgage. The Corbin
Banking Company took the papers, and from blanks kept
by them prepared the mortgage and notes. They forwarded
the papers so prepared by them, the abstract of title and
their check for $1000 to Ocobock. He retained the check
received from them, but sent to Hall & Carter his check for
$800, with the mortgage, notes and abstract of title. They
caused Banks to execute the mortgage and notes, saw that
his title was clear to date, and then delivered to him the
check received from Ocobock. They received the mortgage
and notes, had the mortgage recorded, completed the
abstract of title to date, and forwarded them all to Oco-
bock, who in turn forwarded them to the Corbin Bank.
Upon receipt by the Corbin Bank of the notes, mortgage
and abstract of title, it forwarded them to the New England
Mortgage Security Company, and received $1000. The
notes were all made payable at the office of the Corbin
Bank. A short time before the first interest note matured,
the Corbin Bank addressed a circular, almost entirely
printed, to Banks, which was indorsed at the top, "Very
Important." They reminded him that all payments upon
his loan must be made at their office promptly, and suggested
that it would be better to always have money in their hands
to meet maturing paper a few days before its maturity. They
informed him that they had no agent authorized to collect
his notes; that a payment at any other place than their
bank would be at his risk, and would be of no avail until the
money reached their bank; that no other notice would be
sent him of the maturity of any one of his notes; and that,.
upon a failure to pay one note, all matured.

Banks failed to pay the first coupon note when it matured in 1884, and, on the 6th of June of that year, Hall & Carter notified him that they had just received instructions to advertise and sell the land under the power in the mortgage. A few weeks later Banks paid to them the amount then due on interest, and took their receipt therefor. Their right to make the collection has never been disputed, but was ratified, if not previously authorized, by the acceptance of the money. On the 18th of March, 1888, J. P. Dosh, an attorney at No. 115 Broadway, New York, wrote Banks that he had been instructed by the holder of his notes to make a final effort to collect the interest then due, without recourse to legal proceedings, and saying he would hold his papers and forbear to sue until a reply could be made to his letter. Banks did not reply favorably, and Dosh engaged Hall & Carter to bring this suit. One B J. Martin, an attorney residing in Memphis, had previously written Banks with a view of procuring a settlement of the debt, and had at one time visited the house of Banks for the same purpose. According to Banks' testimony, he represented the Corbin Bank, and in this he is supported by the testimony of its managing officer, who testified that Martin was its agent in Memphis. Martin denies that he represented the Corbin Bank. The testimony contains letters written by him in attempting to collect the loans in Yell county, in which he appears to act for the mortgage company. Banks says that Dosh wrote him as the attorney of the Corbin Bank. Its managing officer says that he is not its attorney. His office and that of the bank are at the same street number, and in the only letter from him which the testimony contains, he refers to the Banks loan by number, and adopts that used by the bank for its convenience.

From the money received by Banks, he paid Hall & Carter for making abstract of title, and White for examining the land and reporting upon it. The amount thus paid, with the 8 per cent. contracted for expressly as interest, would not make the interest excessive, and need not be considered.

These are the only facts elicited particularly connected with the loan to Banks, but the mortgage company, the Corbin Bank and Ocobock have participated and been the actors in many similar transactions during a term of years beginning at the organization of the mortgage company and extending down to the 28th of January, 1889, the day when the depositions in this case closed. A history of their business relations and dealings during those transactions is set out in the evidence, and is pertinent to the inquiry in the case.

The Corbin Banking Company, which shall hereafter be designated as the bank, was organized January 1, 1874, to do a banker's and real estate broker's business. It was and is a partnership. Until 1883, its members were Austin Corbin, J. B. Upham and Francis A. Osborn; and since then they have been Austin Corbin, J. B. Upham, W. H. Wheeler and Fred W. Dunton. The bank had two places of business, one in Boston and one in New York City, until 1883, when the Boston office was closed.

The New England Mortgage Security Company, which will be designated as the company, is a corporation with its place of business in Boston, organized in April, 1875, with a capital of $500,000, for the purpose of lending money on improved farms in the South and West. Of its original stock, the bank subscribed for $25,000, Upham for $22,500 and Corbin for $50,000. Upham was from its organization one of its directors, and Corbin has been one since 1880. They have each retained their interest in its stock, and when the depositions in this case were taken, the bank held $25,000 of its stock standing in the name of some one else. When the company was organized, the Boston offices of the bank were large, and the company took a portion of them. After that and until the bank's Boston office closed, they occupied adjoining offices. Francis A. Osborne was the secretary and treasurer of the bank until 1882, and occupied the same office in the company during part of that time.

The bank was organized to negotiate, and the company to make, loans in the south and west, on the security of improved farms; but neither concern, as their officers testify, ever advertised its business in the country in which it contemplated operating, or had an agent there to further its objects. It is said for the company, that it expected to reach southern and western farmers through brokers; how the bank expected to reach them, it has not explained.

The bank, from the date of its organization to that of taking the depositions, fifteen years, had negotiated 37,428 loans, of which 15,660 had been made by the company. The company, during eleven years after its organization, had made 13,000 loans, of which 12,500 had been made through the bank. That is, during fifteen years of the bank's life, it had done nearly half of its business with the company; while the company, during the eleven years succeeding its organization, had transacted twenty-five twenty-sixths of its business through the bank. From April, 1886, to January, 1889, the company had made 3160 loans through the bank, the business averaging for each day, not including holidays, almost four loans. All loans made by the bank for the company are payable at the bank, and it sends out to all borrowers circulars similar to the one sent Banks, notifying them as to payment of their notes.

Ocobock has acted in connection with the bank in procuring loans on real estate since about the time of its organization, the field of his operation being at different times in Iowa, Nebraska, Mississippi, Washington and Oregon, and the business done aggregating $2,000,000. Many of said loans had been obtained from the company, in some of which payment was resisted upon a plea of usury, out of which litigation had arisen before it began making loans in Arkansas. In September, 1882, Ocobock moved from Oregon to Memphis, where he engaged in the business of soliciting loans on farms in Arkansas. The bank furnished him all blanks needed to carry on the business. There was an understanding between him and the bank that he would

solicit applications of persons wishing to obtain loans on farms in Arkansas, which applications would be presented to the bank; the arrangement contemplated that he would secure reliable attorneys, resident in different parts of the State, whose duty it would be to solicit applications for loans from good men, examine and report on the value of farms offered as security, make and furnish abstracts of titles, and attend to the details incident to closing loans—that is to say, to receive money from Ocobock, see that mortgages and notes were properly executed, and titles cleared of all incumbrances, and then pay over the money, receive the securities, have the mortgage recorded, and forward the securities and abstract to Ocobock. As a remuneration, it was agreed between Ocobock and the bank that 20 per cent. of all loans should be collected from the borrower, out of which he should pay the resident attorney 2 per cent., defray all the expense of his office, and from the balance retain five hundred dollars per month for his services; the balance was to be paid to the bank. He sent an agent to Dardanelle to engage an examiner and attorney. The result was the employment of Hall & Carter, who at his instance published the advertisement seen by Banks. The borrower then dealt with Hall & Carter, they with Ocobock, he with the bank, and it with the lender. Ocobock received applications only from such resident attorneys, the bank would receive them only from Ocobock, and the company, which made seventy loans in Arkansas, made none except on applications presented by the bank.

The bank furnished Hall & Carter all blanks intended to be filled by borrowers, attorneys and examiners. These blanks were designed, executed and furnished to him by the bank; and when properly filled by the parties for whom they were intended, they furnished to the company all the information it desired or ever received as to the character of the applicant and the sufficiency of the security offered. The bank and the company began to do business in Arkansas about the same time. The bank in negotiating each loan

S C—4

supplied information acquired by it after the application for that loan had been made to the local attorney.

The *modus operandi*, as detailed in the bank's loan, was substantially pursued in all the other transactions between Ocobock, the bank and the company.

As to the law governing the case, there is no controversy between counsel; it seems to be conceded that the case is to be determined by the laws of Arkansas.

1. What constitutes usury.

To sustain the plea of usury, it must appear that excessive interest was paid to the lender, or that a bonus or commission was paid to the agent of the lender with his knowledge, or under circumstances from which his knowledge will be presumed, which commission, when added to the interest paid or to be paid the lender, would exceed the lawful rate.

There is no proof of the payment of or agreement to pay excessive interest directly to the company. That narrows the inquiry to the two questions: 1st. Was excessive interest paid to those occupying toward the lender the relation of agent? 2d. Was such payment made with the knowledge, express or implied, of the lender?

2. Proof of agency.

The bank, Ocobock and Hall & Carter, divided among themselves 20 per cent. of the sum borrowed. What were their relations to the lender and borrower respectively?

Hall testified that his firm advertised that it could negotiate loans at the instance of Ocobock, and that he arranged with them to assist him in negotiating loans. In assisting him they were expected to solicit applications for loans from good men, to examine and report upon security offered, and prepare and furnish abstracts of title; to report upon the character of applicants for morality, sobriety, industry and promptness in the payment of debts; to receive and hold moneys forwarded for applicants until all defects of title were cured and the notes and mortgages executed, and then to pay over the money and receive the securities. They were engaged by Ocobock to assist him, and all the services they performed were for the protection of the lender. In the long enumeration of their duties, as set out in the evi-

dence, there is none which is designed for the benefit of the borrower. They all arise from the employment of Ocobock. Nothing done by the attorneys was at the instance of the borrower, or under his direction. He did not direct the examination of his land or the report upon his character. It was not at his request, nor in his interest, that money forwarded by Ocobock should be held by the attorneys until all flaws upon his title were cleared away and the mortgage on his farm executed. That was a part of their duty—but of a duty owing to some other than him. They were employed by Ocobock to assist him, they did assist him, and they were paid by him according to the terms of their employment. But it is insisted that Banks signed an agreement with them, wherein it was recited that he employed them to act as his agent in procuring the loan. The recital of a falsehood does not alter facts, nor does its incorporation in a written instrument prejudice existing rights, where it is uncredited and the truth known at the time. To hold that Hall & Carter were the agents of Banks would be to sanction an obvious juggle.

The attitude of Ocobock is determined without difficulty. It is contended that he was the agent of Hall & Carter. The testimony of Hall that Ocobock employed them, is conclusive against the contention. The relation of principal and agent is not instituted by the agent; on the contrary, principals create their agents. As Hall & Carter were employed by Ocobock to assist him, so he was employed by the bank to assist it. It was a part of the bank's purpose to negotiate loans on southern farms. It placed him in Memphis, prepared to receive the applications of borrowers, and fully instructed as to the manner of conducting the business. It furnished him a complete system of blanks which it had devised for the business, designed to afford all the information which a lender could desire, when properly filled out by applicants, attorneys and examiners. As the letters accompanying the applications in evidence show, no explanation from him to the bank was needed to inform it what he

wanted, from whom he wanted it, or on what terms he would like it; but when an application was received by the bank, it understood the thing to be done. But it never proceeded to obtain the loan until it had in its possession the contract from the applicant for the payment of commissions; although the contracts were made with the local attorney, they were turned over to the bank, which was treated as entitled to their custody. The agreement between them and their conduct under it clearly show that he was the agent of the bank. It is contended that he was not the agent because he had no authority to close a loan; the argument goes to the extent of his agency, not to its existence.

It has been more difficult to determine the attitude of the bank toward the parties. The mortgage company was organized to lend money in the south and west, keeping its office in Boston. Its residence and that of its officers were quite removed in distance and business associations from the field of its contemplated activity. It must have contemplated some means of reaching the farmers whose business it sought. To invest large sums in a loan company, without opening some channel of communication between it and the borrowers, would ill comport with the shrewdness and sagacity usually displayed by intelligent capitalists. Its officers testify that they never advertised its business, and had no agents to promote it. It would lend only on the security of first mortgages on improved farms, and then only upon being satisfied that the security was sufficient and the borrowers good ones; but it employed no means to obtain this information, and relied upon getting it from borrowers and their agents. It is seldom that, in such important matters, so great reliance is placed by one party to a transaction on agents selected by the other.

But the bank, in whose apartments the company had its birth, went into the territory of the company's contemplated operations, and advertised to negotiate loans upon stated terms, which terms were the same as those contemplated by the company; when applicants for loans came, the bank

procured, without suggestion from the applicants, all the information which the company desired, and without which it would not lend. It engaged attorneys and examiners, resident throughout the country, to the end above stated, whose duties were well understood, and through whom the interest of the lender was jealously guarded from the moment the applicant presented himself until his mortgage had been recorded and forwarded. By these agencies those things were done, guarded or ascertained, which pru· dent men in lending money usually see to in person. Of the value and necessity of such services the company furnishes proof, for they would make no loan unless they were performed. It is said that brokers in New York and Boston sought all the money they had and relieved them of the necessity for activity. The force of the explanation would be greater if it were not conceded that, after doing business for fourteen years in various States and making fifteen thousand loans, twenty-five twenty-sixths of its business had been done through one broker. That such should be true would excite no surprise if it were stated that the lender employed the broker to find borrowers and lend his money ; but it is remarkable, to say the least, that such a proportion of all its borrowers should have engaged the same broker to deal with it.

This is not a case in which a broker, in the ordinary course of his business, has acquired information of men or property, which he gives, when asked, to those with whom he deals. The bank and the company began to do business in Arkansas at the same time, and the bank knew nothing from its past business of borrowers or securities which it could communicate. It, in order to acquire the necessary information, was bound to incur the expense of travel and employing agents, just as the company would have been if it had seen fit to seek its own information. In this case the bank has incurred expense and trouble to obtain information which the company expected and demanded, but would not pay for. It is said in the testimony

that the company could not meet the expense and lend money at lawful interest. That is perhaps a reason, but it is no justification, for a charge of excessive interest.

The bank not only performed all the service which the company might have performed to protect itself before lending the money, but was equally watchful for its collection after the loan. All notes were payable at the bank. The bank gave notice of the first maturing note, and the lender remained passive until after default. The bank, assuming that it alone looked after payments, stated in its circular that no notice would be given of payments to fall due after the first one. It also interested itself to see that the taxes were paid on lands mortgaged. Another fact, remarkable upon the theory that the broker acted as agents of the borrower, is that the broker knew in advance exactly the terms upon which money could be obtained, and that, in this world in which all things are subject to the law of change, those terms never changed. The borrower was told, when he applied for money, how his loan must be secured, the term it would run, and the interest it would bear. All those things were unalterably fixed and understood by the broker before he sought or found the borrower. This fact suggests the idea of a possible pre-arrangement between the broker and the lender. If the broker had been in fact employed by the borrower, it is reasonable to assume that he would have gone into the money markets to obtain the loan on the most favorable terms possible, and could have informed the applicant of such terms only after such an effort. Surprise at the broker's inaction in this respect gives way, upon the theory that he was lending money under instructions from its owner.

Without a more extended discussion of the facts, we are satisfied that it was understood between the bank and the company, that the bank would solicit borrowers in the south and west, make the necessary examinations, and obtain the desired information as to security and borrowers, and present applications and information to the company; that the

company would accept such applications to the extent of its fund, as it deemed safe; that the bank would see that the securities were properly prepared and executed, and the title to the mortgaged property perfected, and would attend to the collection of notes as they matured. Such an agreement between the bank and the company may not have been express, but a consideration of their intimate relations toward each other, of their respective business purposes and of their large and constant dealing for a number of years in that uniform manner, precludes all doubt that it was understood and relied upon by them. The services, for which the commission was retained, was performed under that understanding with the company and for its benefit; as a consequence those who rendered them are to be regarded as its agents.

That the company knew that the commissions were paid cannot, we think, be controverted. It had made loans through the same parties in Nebraska, the payment of which was resisted for usury. Those loans resulted in many suits, in which the depositions of the bank's officers were taken. To presume that the company's officers knew the material facts developed in those cases would be only to impute to them ordinary attention to business. They admit that they knew that usury was set up, and virtually concede full information. Soon after the trouble in Nebraska, the same parties—that is to say, Ocobock and the bank—began to negotiate, and the company to make, loans in Arkansas upon substantially the same plan and terms as formerly in Nebraska. The company, having learned of the terms on which the bank did its business before the loan in controversy was made, was reasonably apprised that it would be made on the same terms. But it also knew that the services had been rendered, that it had enjoyed the benefit thereof, and that it had paid nothing therefor. This would give it reasonable notice that the borrower, the only other person interested, had paid for it.

3. Usury—Agent's commission.

That the method employed in making the loan in controversy was designed to evade the usury laws, we feel convinced. The determination to prevent usurious exactions in this State is manifest both in its organic and statute laws. If taking excessive interest is an evil when not prohibited by law, the evil is magnified if permitted to flourish against and in defiance of law. It would mock the power of the government and degrade it in general esteem, if its ordinances directed to the extinction of abuses, could be diverted from the objects contemplated by cloaks and coverings. Whenever they are employed to prevent a law's enforcement, they should be cast aside, and the law given its proper course. Courts should not be imposed upon by the name which is given to a transaction, or by the outward form it assumes; but, when necessary to ascertain realities, should ignore names and look through forms. That appellant executed the documents in which it was alleged that Hall & Carter and their assistants were his agents, does not alter the facts; that statement was designed to give a deceptive form and outward appearance to the transaction; it was not true, and its reiteration gave it no force. If exacting usury in an open manner is to be condemned, it merits no higher consideration when it asks immunity upon a sacrifice of candid and open dealing.

Under the view of the facts taken by us the decree will be reversed, and a decree rendered here in favor of appellant.

---

[Supplemental opinion on motion for rehearing. Filed May 23, 1891.]

HEMINGWAY, J. In the determination of this cause we announced as our finding of facts that the bank, in pursuance of an understanding with the company, entered a field unoccupied by either of them, for the purpose of soliciting and obtaining borrowers for the company; that in this way the company obtained most of its business, including the application of the appellant; that the bank, for its service

in procuring this application and closing the loan, collected a commission of which the company was informed ; and that the commission, with the interest agreed to be paid to the company, exceeded 10 per cent. per annum. Upon those facts our conclusion of law was, that the bank was the agent of the company, and that the loan was usurious. Upon a similar state of facts we had so ruled at a former term in the case of *Thompson* v. *Ingram*, 51 Ark., 546, in which the excessive commission had been paid to a party doing business as a broker.

The motion for a rehearing challenges the correctness of our finding of facts and of our conclusions of law thereon, and is supported by elaborate briefs, ably and persuasively urging the views of counsel.

No good could be accomplished by a repetition of the testimony or of our opinion regarding it. Upon the original consideration of the cause we carefully read, scrutinized and weighed the evidence, and reached our conclusion after the most mature deliberation. The arguments in support of this motion have received a like consideration at our hands, and our convictions remain as formerly expressed. We think the testimony not only supports our finding of facts, but precludes any other. If the bank was the agent of the company, the collection of excessive interest by it with the company's knowledge is imputable to the company, and this without reference to what the general business of the bank may have been. We think our judgment is right, and the motion to reconsider will be denied.