LANIER *v.* UNION MORTGAGE, BANKING & TRUST COMPANY.

Opinion delivered April 24, 1897.

PLEADING—FAILURE TO DENY CONCLUSION OF LAW.—An allegation in a complaint that the note sought to be cancelled was •executed with reference to the laws of another state is a statement of a conclusion of law, and is not admitted to be true by failure of the defendant to deny it in his answer.   (Page 46.)

CONFLICT OF LAWS—PLACE OF CONTRACT.—Where the parties to a mortgage of land reside in different states, they may in good faith contract that it shall be construed with reference to the laws of the state wherein the mortgagor resides and the land is situated.   (Page 47.)

EVIDENCE—INTERROGATORIES AND ANSWERS.—The statute which provides that in equitable proceedings either party may annex written interrogatories to his pleading to be answered by the adverse party contemplates merely that such answers may be used as a deposition for or against the party interrogating and the party answering.   (Page 50.)

USURY—MONEY ADVANCED TO PAY USURIOUS DEBT.—A note is not usurious because given for money advanced by the payee at the maker's request to pay off a usurious debt to a third person.   (Page 51.)

SAME—FAILURE TO FURNISH SUPPLIES.—Where a note bearing the highest legal rate of interest is given to cover supplies and money to be furnished, a failure to furnish a part thereof is a partial failure of consideration merely, and does not render the loan usurious.   (Page 51.)

SAME—EXCESSIVE CHARGE.—A note given for supplies to be furnished, providing for the highest legal rate of interest, will not be rendered usurious by the fact that the payee charged the maker with profits on the supplies furnished, where there was no agreement to pay such profits, and such charge was by consent eliminated from the account for such supplies.   (Page 52.)

ACCOUNT—CONCLUSIVENESS OF SETTLEMENT.—Where a party has full opportunity to examine an account rendered, and, with knowledge that it is erroneous, approves it and executes notes to cover the apparent balance against him, he cannot subsequently impeach such account, save for fraud or mistake.   (Page 52.)

PROMISSORY NOTE—BONA FIDE HOLDER—DEFENSE.—To a note given in settlement of an account it is no defense, as against a *bona fide* holder, that the settlement was procured by fraud or mistake.   (Page 53.)

Appeal from Mississippi Circuit Court in Chancery.

JAMES E. RIDDICK, Judge.

*Johnson & Coleman*, for appellant.

Ocobock was the agent of the Corbin Banking Company, and the bank was the agent of the mortgage company, and knowledge and participation in the illegal reservation of twenty per cent., called commissions, was brought home to the bank and the company, and rendered the loan usurious. 54 Ark. 50; 51 *id.* 545; 27 Am. & Eng. Enc. Law, 1007; 33 Conn. 86; 43 Minn. 310; 110 U. S. 14; 46 Minn. 360; 32 Fed. Rep. 113. The Corbin Banking Company loans were usurious because the notes bore interest at the highest legal rate of interest, whereas the money was not paid to the borrower until long afterwards. 63 N. W. Rep. 787; 10 Atl. Rep. 287; Perley on Interest, 223 *(g)*. They were further usurious because the bank, instead of paying the borrower in money, furnished him supplies, upon which it secretly charged a large profit. 35 Ark. 217. These loans were New York contracts, and usurious under the laws of that state. 54 Ark. 573; 3 Am. & Eng. Enc. Law, p. 550, note 3; 1 Neb. 108; 88 Pa. St. 118; 10 Wheat. (U. S.), 367; 4 Peters (U. S.), 211; 10 Wis. 333; 2 Ark. 382; 53 Barb. (N. Y.), 350. The loan by the Real Estate Mortgage Company was a mere consolidation and renewal of Lanier's former indebtedness to the Corbin Banking Company. This new company was created for the express purpose of cutting off any plea of usury, a mere sham and device of the Bank. 54 Ark. 155; 35 N. W. Rep. 265; 27 Wis. 177; 15 Mass. 95; 39 Iowa, 549; 9 Cowen (N. Y.), 647; 71 Iowa, 50; Cook on Stock and Stockholders, § 663*a*; *ib.* § 6; Spelling, Priv. Corp. §§ 829, 831; 31 Mich. 490; 85 Tenn. 572; 23 Atl. Rep. 806; 87 Ala. 211; 20 Fed. Rep. 700. They were void even in the hands of innocent holders. 41 Ark. 331. They were New York contracts. 60 Ark. 269.

*Watson & Fitzhugh*, for appellee.

The accounts cannot be opened up now except for fraud or mistake. 58 N. W. Rep. 830; 36 Pac. Rep. 382; 31 Ill. 487; 4 Dana, 109; 5 Jones, L. 284. Facts *known to a party* when he settled an account cannot serve him afterwards to impeach it. 66 Mo. 603; 53 Mo. App. 610; 53 Ark. 160; 41 *id.* 503; 93 Ga. 515. The allegations in the complaint that these were New York contracts and void under the laws of that state are not

sufficient to call for a denial. 5 Iowa, 357; 4 *id.* 464; 2 Mass. 34; 10 Wend. 75; 1 Mass. 103; 2 East. 260; 8 Mass. 99; Rorer on Int. Law, p. 163. The burden was on appellant to prove usury. 3 Green (N. J.), 481; 69 N. Y. 339; 57 Ill. 138; 36 Wis. 390; 22 N. J. Eq. 606; 25 *id.* 491; 34 N. Y. 444; 48 Ill. 353; 17 Vt. 231; 2 Green (N. J.), 460. The evidence fails to sustain the plea. 25 Ark. 195; 44 Barb. 521; 3 Day, 268; 2 Rice, Ev., p. 1304; 57 Ark. 353; 57 Ark. 255, 256. It was expressly agreed that these contracts should be governed by the laws' of Arkansas. This was valid. 15 S. E. Rep. 812; 88 Ga. 756; 79 Tex. 247.

BATTLE, J. This action involves eight mortgages or deeds of trust, and the debts they were made to secure. They are attacked on the ground of usury. The following are substantially the facts of the case, as we find them:

First. Some time in 1883 Lanier saw an advertisement of A. W. Ocobock in a newspaper published at Memphis, Tenn., in which he claimed to represent capitalists who proposed to make loans on improved lands in Arkansas. Lanier called at his office in Memphis, and made arrangements to secure a loan through him. He executed a note for $8,600 to the American Freehold Land Mortgage Company, of London, the lender, dated February 10, 1883, and payable five years from date at the office of the Corbin Banking Company, in the city of New York. To this note five coupons were attached for interest on the same at eight per cent. per annum, payable on the first of January, 1884, 1885, 1886 and 1887, and on the 15th of February, 1888, respectively, the first for $611, the second, third and fourth for $688 each, and the last for $784.84. To secure the payment of the principal note and coupons, Lanier executed to J. K. O. Sherwood, as trustee, a deed of trust conveying lands in Mississippi county, in this state, and, after delivery of the papers to the lender, received from Ocobock a check on the Union & Planters' Bank, of Memphis, for $6,780. The difference between the amount received and the sum specified in the note, to-wit: $1,820, was retained by Ocobock for commissions and expense. The commission was $1,720, which was twenty per cent. on the face of the loan. The expense was $100,

which was for looking at the land as he passed by it on a steamboat, and for examining title. The deed of trust provides: "The contents embodied in this conveyance, and the notes secured hereby, shall in all other respects be construed according to the laws of the state of Arkansas, where the same is made."

Lanier relies on various circumstances to show that the persons through whom he secured the loan were agents of the lender, and that it knew its agents collected usurious interest on the money loaned. But it is unnecessary to mention these circumstances, for reasons hereafter appearing.

. Second. Owing to misfortune in business, Lanier was unable to pay the interest on the $8,600 which was due and payable in 1884 and 1885. He was a planter, and needed money to enable him to cultivate his plantation. On account of his financial embarrassment, he made contracts at various times with the Corbin Banking Company, a New York firm engaged in banking and brokerage, to advance to him money and supplies. An estimate of the amount needed by him in each year was made, and he executed a note for the same at 10 per cent. per annum interest thereon from date, payable to F. W. Dunton, a member of said company, at the office of the banking company, in the city of New York, and at the same time executed a deed of trust, in which W. G. Wheeler was trustee, to secure the payment of the note. In each deed of trust it was stipulated that it and the note secured thereby, except as therein otherwise provided, should "be construed according to the laws of the State of Arkansas, where the same is made." The money or supplies were advanced as Lanier requested, and were charged to him, together with 10 per cent. per annum interest thereon from the date of the same, on account. In their dealings after the execution of the deed of trust, it seems, no attention was paid to the notes, but the parties were governed by the account in ascertaining the amount of Lanier's indebtedness to the bank.

In the manner indicated, notes and deeds of trust were executed by Lanier as follows: On the 15th of April, 1885, a note for $1,500, with a coupon for $106.25 for interest attached; on the 5th of March, 1885, three notes for $2,400 each, payable on December 1, 1886, 1887 and 1888, respect-

ively; on the 26th of May, 1887, a note for $2,500; on the 10th of April, 1888, a note for $3,000; and on the 3d of March, 1890, a note for $3,000; and on the day of the execution of each of these notes a deed of trust was executed by him to secure the payment of the note or notes made on that day.

In November, 1890, Alma C. Sherman held two notes for $1,660.49 each, and interest from date, which were executed by Lanier to her at Memphis, Tenn., on the 1st of September, 1882, and secured by a deed of trust of same date. On the 8th of November, 1890, the Corbin Banking Company, at the request of Lanier, purchased the notes and deed for its own benefit. On the 19th of March, 1891, Lanier was also indebted to Hirsch Brothers in the sum of $10,898.62, and this, too, was secured by a deed of trust, and was purchased by the banking company, at the request of Lanier, for its own benefit. All these claims were transferred to William J. Kelley for the use and benefit of the banking company, although it was not so stated in the assignment.

On the 26th of March, 1891, Lanier was indebted to the Corbin Banking Company as follows:

On account of the Sherman debt....................$ 5,000 00
On account of the Hirsch Brothers' claim.......... 10,892 52
On account of moneys and supplies advanced....... 14,995 38

Making in the aggregate ........... ..........$30,887 90

Third. In February or March, 1891, a statement of the account of Lanier with the Corbin Banking Company, together with the original vouchers for the moneys charged, were submitted to Lanier for the purpose of ascertaining and adjusting his indebtedness on that account. After examining them, he objected to the items of profits on the amounts paid for supplies purchased for him, and these items were eliminated from the account, which left him owing the $14,995.38. About this time, or soon after, the banking company, through its attorney, J. H. Watson, a lawyer of Memphis, proposed to him that it would negotiate a loan of a sum of money on five years' time, sufficient to pay his indebtedness of $30,887.90 to it and the amount he was owing to the American Freehold Land Mortgage Company, if he would secure the loan by a deed of trust upon

his property. After considering the proposition for several weeks, he accepted it. Upon being informed of that fact the banking company forwarded to its attorney at Memphis papers of the following description: five blank notes bearing date the 26th of March, 1891, for the aggregate sum of $41,792.84. and payable to the real estate mortgage company, of the county of Cumberland, in the state of Maine; a blank deed of trust, of the same date, containing a statement that the contracts embodied therein, and the notes secured thereby, except as therein otherwise provided, "shall be construed according to the laws of Arkansas, where the same is made," to secure the same; a statement showing the amount due it from Lanier on account of advances, with the profits on supplies and merchandise eliminated; and a statement showing the amount due the Freehold Company, including interest to the 26th of March, 1891, to be $10,904.94. After receiving these papers, the attorney submitted to Lanier the statement showing the amount due on account of advances. After many weeks' deliberation, Lanier executed the notes and deed of trust in the form they were forwarded by the banking company to its attorney (the notes being for the sum total of the $30,887.90 due the banking company and the $10,904.94 due the Freehold Company), with the agreement and understanding by the parties that the securities which belonged to the banking company should be " kept alive," and should be held by the owner of the five notes for the purpose of protecting him against prior liens.

James H. Watson, to whom these notes and the deed of trust were delivered, then gave Lanier a sight draft on the Real Estate Mortgage Company for $41,792.84, and Lanier transferred it to the banking company, with instructions to collect it and apply the proceeds to the payment of the debts for the payment of which the new loan was to be made. Watson, who was also the attorney of the Freehold Company, and held Lanier's note to it for collection, thereupon accepted the settlements, and offered to surrender the note and the deed of trust which secured the same, together with a release to Lanier by the trustee therein, or hold the same for him. Whether the check was paid or not is not positively shown by any competent evidence. The five notes were, however, transferred to

the Union Mortgage & Trust Company, of London, by the Real Estate Mortgage Company, without recourse.  Lanier states in his brief that George H. Bullock, the secretary of the Union Mortgage & Trust Company, a competent witness, testified that the last mentioned company purchased these notes from the Corbin Banking Company on the 25th of June, 1891, and paid therefor $41,792.84, upon its (banking company's) written guaranty of the collection of the entire principal of the five notes, and at least 7 per cent. per annum interest thereon.  (We rely upon the brief because we are not referred to the pages of the very voluminous transcript in this case upon which this statement can be found, and because no one denies that the witness, Bullock, testified to that effect).  This testimony is not contradicted, and we take it to be true.  No creditors of Lanier complains of Corbin failing to negotiate the loan and appropriate it as he was instructed to do.  Watson still holds for Lanier the deed of trust in favor of the Freehold Company, the note secured thereby, and the release of the trustee.  The strong presumption is, the Freehold Company has been paid.

Fourth.  On the 26th of May, 1891, Austin Corbin loaned to Lanier, at his request, the sum of $1,500 to enable him to cultivate a crop during the year 1891, and took his note for that sum, bearing ten per cent. per annum interest from date, payable at the office of the Corbin Banking Company, in the city of New York, on the first day of December, 1891.  The note was secured by a deed of trust, containing the following clause:  "The contract embodied in this conveyance, and the note secured hereby, are made with reference to the laws of the state of Arkansas, where the said party of the first part (Lanier) resides, and shall be in all respects construed according to said laws."  Watson, the attorney of the Corbin Banking Company, was, prior to this time, notified of the agreement to loan, and requested to prepare the note and deed of trust, and to say to Lanier that the money would be advanced through Watson.  The money, however, was placed to Lanier's credit at the date of the note, and was paid out at intervals, from May 26th to July 27, 1891, on drafts drawn by him in favor of Watson and indorsed by said payee.

Upon the foregoing facts the circuit court found that the five notes bearing date the 26th day of March, 1891, were executed by Lanier in consideration of the sum of $41,792.84 loaned to him by the Real Estate Mortgage Company, "and that the same were transferred before maturity, to-wit: on the 25th day of June, 1891, to the said Union Mortgage, Banking & Trust Company by the said Real Estate Mortgage Company, in good faith and for a valuable consideration," and rendered judgment against Lanier in favor of the Union Mortgage, Banking & Trust Company for the sum of $52,352.44, the amount of principal and interest due on the five notes at the date of the judgment; and decreed that the deed of trust executed to secure the same should be foreclosed; and Lanier appealed.

Appellant contends that the notes dated March 26, 1891, and the debts which constitute the consideration thereof, were confessed to be usurious by the failure of the Union Mortgage Banking & Trust Company to answer or deny certain allegations in his complaint. The allegations are: "Defendant, Lanier, here specifically states and charges that the notes of date March 26, 1891, and all prior notes merged into them, were and are payable at the office of the Corbin Banking Company, in the city and State of New York. That under the laws of the State of New York, as they then and now exist, all contracts whereby a greater rate of interest is reserved or charged for forbearance in excess of seven per cent. per annum are declared usurious and void, and the penalty for an infraction of the law is total forfeiture of principal and interest, and defendant, Lanier, as well by answer as cross-complaint, inasmuch as New York is designated as the place of performance, here specifically and specially pleads the laws of the state of New York in discharge of the usurious and void (notes) under said laws of the place of performance." But in these allegations there is no averment of a fact which shows that the notes referred to were governed by the laws of New York. If, however, they be interpreted as meaning to say as much, then they state a conclusion of law based on the fact that the notes were payable in the city of New York, a conclusion which is by no means correct because the fact on which it is based is true. But it is not

within the province of Lanier to allege in his complaint conclusions of law, or the duty of the Union Mortgage, Banking & Trust Company to admit or deny them in its answer because they were alleged. It was their privilege to state facts, and the duty of the court to determine the law, and it was not bound to accept the conclusion of law of one of the parties as true, because it was not contradicted by the other, but on the contrary should disregard it.

In other portions of the same complaint it was repeatedly alleged that the notes and deeds of trust were void for usury because in violation of the constitution of the State of Arkansas, which is inconsistent with any allegation that might have been made to the effect that they were made with reference to, or were to be governed by, the laws of New York.

The parties to these contracts were citizens of different states,—Lanier of this state, and the others, respectively, of New York, Maine and England. At the time they were entered into and reduced to writing in the form of notes and deeds of trust, and signed, Lanier was temporarily in Memphis, Tenn., for that purpose. The lands mortgaged to secure the payment of the notes are in this state, where Lanier resided. Having the right, under these circumstances, to contract with reference to the laws of one of two or more states, they agreed that the notes and deeds, except as therein otherwise provided, should be construed according to the laws of Arkansas, and were made in this state,—that is to say, were made with reference to the laws of this state, and should be governed thereby,—and incorporated the stipulation in each deed of trust, evidently intending that the laws of Arkansas should govern as to interest. As an evidence of this fact, the notes were made to bear 10 per cent. per annum interest—the highest rate of conventional interest allowed in this state—and Lanier alleges in his complaint: "Each and every one of the trust conveyances mentioned in this complaint is usurious and void under the constitution and laws of Arkansas, which are . as much a part of each and every one of the said several mortgages (deeds of trust) as if set out *in haec verba* in the body thereof."

The effect of the stipulation referred to is the first subject for consideration in the decision of the questions presented by

this appeal.   It is well settled that parties, in making a contract in one state to perform in another, may stipulate that it shall be governed and controlled by the laws of one or the other.   As this is true, why is not the stipulation in this case valid?

In *Kellogg* v. *Miller*, 13 Fed. Rep. 198, the contract in question was for the loan of money to a resident and citizen of Nebraska, and was secured by a mortgage on lands of the borrower in that state.   Judge McCrary, in delivering the opinion of the court, said:   "But it is not necessary to place the decision of the case upon the ground that the contract was to be performed in Nebraska.   It is now well settled by authority, as it is certainly well supported by reason, that a citizen of one state may loan money to a citizen of another state, and contract for the rate of interest allowed by the law of the latter, especially in a case like the present, where the money is to be used in the latter state, and is secured by a mortgage upon lands located there;   and this notwithstanding the place of payment may be elsewhere.   This doctrine constitutes an exception to the general rule that the law of the place where the contract is made is to govern in enforcing and expounding it.   Thus, in the case of *Arnold* v. *Potter*, 22 Iowa, 194, it was held that it was competent for citizens of different states, who are parties to a promissory note, to contract in good faith for the rate of interest, and with reference to the law of the state where the maker resides, and where the property mortgaged to secure the note is situated, although the note is in terms payable in a state different from the residence of either, and the rate of interest reserved is greater than the legal rate of the state where the note is made, or where by its terms it is payable.   In that case Wright, J., said:   'The general rule is well settled that the law of a place where a contract is made is to govern in enforcing or expounding it, unless the parties provide for its execution elsewhere, in which case it is to be governed by the law of the latter place.   The parties may, however, if it is made in one place to be executed in another, stipulate that it shall be governed by one or the other.'   And again:   'Nor do we hold that a citizen of one state could make his note in another to a resident there, payable in a third, with interest

as allowed in a fourth.  But what we do hold is that if A, of Iowa, in good faith borrows money of B, of Illinois, gives security on land in Iowa, and they in good faith agree that the law of Iowa shall govern, that a note given in pursuance of said contract in Illinois, bearing the interest allowed by our laws, would not be usurious.'  *  *  *  In applying this rule in this case, there is but a single question of fact to be considered, and that is the question of good faith.  Did the parties in good faith agree that this loan should be made according to, and to be governed by, the law of Nebraska?"

In *Dugan* v. *Lewis*, 79 Texas, 246, Dugan, "who at the time was a resident citizen of the State of Texas, acting through an agent in the State of New York, borrowed from the American Freehold, Land & Mortgage Company, of London, England, the sum of $5,000. .Dugan executed 'his note in favor of the mortgage company for said sum, payable at the office of the Corbin Banking Company in New York city five years after date, with interest from date at the rate of eight per cent. per annum, for which five coupon notes were attached to said note.  *  *  *  *  Dugan, to secure said note, executed a deed of trust upon land in Texas, in which one Sherwood, the agent in New York of the lender, was made trustee.  The agreement to lend the money was made in the State of New York, and the deed of trust and the note were delivered to the lender in that state.  The $5,000 were paid to Dugan's agent in the State of New York.  The note and coupons and the deed of trust were dated and signed by Dugan in the State of Texas.  The deed of trust contained the following clause: *  *  *  'The contracts embraced in this conveyance, and the notes secured hereby, shall in all other respects be construed according to the laws of the State of Texas, where the same is made.'  At the date of these transactions the rate of interest in the State of New York was six per cent., and the reservation of a greater interest rendered the contract void," but in the State of Texas it was valid.  After a review of the authorities upon the question, the court upheld the contract.  To the same effect, see *Jackson* v. *American Mortgage Co.* 88 Ga. 756.  See, also, *Chapman* v. *Robertson*, 6 Paige, 627; *Bullard* v. *Thompson*, 35 Texas, 313; and 1 Randolph, Commercial Paper, p. 23.

4

We think that the stipulation in question, under the circumstances mentioned, if entered into in good faith, is binding upon the parties. There is no good reason why it should not be. Lanier being a resident of this state, and the property mortgaged located here, it does not appear that the collection of the notes through the means provided for that purpose in the deeds of trust could be enforced in any state except the State of Arkansas. To hold that it is void would compel our courts in all such cases to enforce the laws of other states against parties, and impose upon them their penalties and consequences, when they have contracted in good faith with our resident citizens, and in respect to lands located here, in conformity to our laws, and agreed to be governed by them.

The next subject for consideration is a question in respect to the admissibility of evidence. Lanier propounded written interrogatories to adverse parties in this action, and they filed their answers. The question is, to what extent can these answers be used as evidence? The statute upon this subject provides that in actions by equitable proceedings either party may propound written interrogatories to any one or more of the adverse parties "concerning any of the material matters in issue in the action; the answers to which, on oath, may be read by either party, as a deposition between the party interrogating and the party answering." (Sand. & H. Dig., § 5778.) Their use is expressly limited by the statute. They can be read as depositions for or against the party interrogating or the party answering; and to this extent, and no farther, they are admissible as evidence.

The decree appealed from rests upon the validity of the five notes which were executed to the Real Estate Mortgage Company, of the county of Cumberland and State of Maine, and were dated the 26th of March, 1891. Were they void for usury under the constitution and laws of Arkansas? Their consideration, as before stated, was for money borrowed to pay the following debts:

The Sherman debt...............................$ 5,000 00
The Hirsch Brothers' claim.......... ............. 10,893 52
The American Freehold Land Mortgage Co. note.... 10,904 94
The notes for moneys and supplies advanced........ 14,995 38

The first two debts were not controverted; the other two are attacked on the ground of usury. As to the note in favor of the American Freehold Land Mortgage Company, it is not necessary to inquire whether it was infected with usury. It is not denied that it was given for a loan by the company to which it was executed. The presumption, for reasons before indicated, is, it has been paid by moneys advanced on the five notes of March 26, 1891. The moneys with which it was paid were not advanced by or for the American Freehold Land Mortgage Company. This being true, so much of the five notes as covered the amount so paid thereon was not void on account of any usury that might have been in the note thereby paid. Such moneys were advanced at the request of Lanier, who executed the five notes, and there is no agreement to pay exceeding ten per cent. per annum interest for the loan of the same. That being true, the five notes cannot be affected by usury as to that portion of their consideration which was used in the payment of the American Freehold Land Mortgage Company note. The two transactions are distinct; the considerations are different; and one is not affected by usury in the other *Cottrell* v. *Southwick*, 71 Iowa, 50; *Vaught* v. *Rider*, 83 Va. 659; *Coffman* v. *Miller*, 26 Gratt. 698; *Drake* v. *Chandler*, 18 Gratt. 909.

The seven notes executed to F. W. Dunton for moneys and supplies to be advanced, and which were furnished, to Lanier by the Corbin Banking Company, remain to be considered. Appellant, Lanier, insists that these notes are void for usury—first, because they bear interest at the highest lawful rate from their dates, when the money for which they were given was not paid to the borrower until long afterwards; and, second, because, instead of paying to the borrower the amount of his loans in money, the bank furnished him with supplies, upon which it secretly charged a large profit, for the corrupt purpose of thereby realizing more than ten per cent. per annum for the use of its money.

These notes were executed to Dunton in consideration of the promises of the Corbin Banking Company to furnish and advance to Lanier, in each year in which they were, respectively, given, moneys and supplies needed by him in the culti-

vation and improvement of his farm in this state. There was no agreement to give or receive more than ten per cent. per annum interest on the moneys and supplies advanced. If there was any failure on the part of the bank to furnish any part of the moneys and supplies in consideration of which the notes were, respectively, given, there was a partial failure of consideration, and no usury. The notes and deeds of trust were valid securities for so much as was advanced by the bank, to the extent of the amount for which they were given. *Pillow* v. *Sentelle*, 49 Ark. 430; *Forsyth* v. *Preer*, 62 Ala. 443; *Huckaba* v. *Abbott*, 87 Ala. 409; *Louisville Banking Co.* v. *Leonard*, 13 S. W. Rep. 521; *Fisher* v. *Otis*, 3 Pin. (Wis.), 78; *Lawrence* v. *Tucker*, 23 How. 14; 1 Jones, Mortgages (5th Ed.), § 374.

The charging Lanier with profits on supplies furnished, in addition to ten per cent. per annum interest on the amount paid for the same, did not stamp the taint of usury upon the notes and deeds of trust. There was no agreement to pay profits, and consequently more than ten per cent. per annum interest was not reserved, taken, or secured by contract in any form. Moreover, there was a settlement between Lanier and the bank, in which these profits were eliminated from the account against Lanier; and the five notes executed to the Real Estate Mortgage Company were not made to procure a loan to pay the seven notes, but the amount actually due for money and supplies and lawful interest. So the five notes are not infected by reason of usury therein, or in the seven notes.

But appellant says he does not owe the $14,995.38 with which he was charged by the Corbin Banking Company for advances, and that in the statement of the account in which this amount was claimed to be owing by him there are many overcharges and omissions to give him proper credits; and insists that these errors should be corrected. This impeachment of the account is too late. It was submitted to him for examination. He testifies that he was aware it contained every item that the bank claimed to be owing by him. He had ample opportunities to examine it. After several weeks' deliberation, he signed and delivered the five notes of March 26, 1891, and the deed of trust to secure the same, notwithstand-

ing he now testifies that he knew at the time the account was largely in excess of what he was owing.   It could have been corrected between the parties to the same only for fraud or mistake (*Weed* v. *Dyer*, 53 Ark. 155; *Lawrence* v. *Ellsworth*, 41 Ark. 502), and none is shown.   And if it was, he could not set it up as a defense against the notes, as they belong to a *bona fide* purchaser, which acquired them before maturity.

As to the note for $1,500, dated the 26th of May, 1891, and payable to Austin Corbin, and secured by deed of trust, there was no adjudication or judgment rendered by the circuit court.   It was entirely disconnected from, independent of, and subsequent to, the five notes of date the 26th of March, 1891, and payable and belonging to a different party.   The adjudication as to one has no influence or bearing upon the other.   The result is, it is not affected by the appeal in this cause, and no question in respect to the same is presented to us for decision. *Walker* v. *Pritchard*, 121 Ill. 221; *Union Trust Co.* v. *Trumbull*, 137 Ill. 146.

Decree affirmed.

RIDDICK, J., was disqualified.

BOURLAND, Special Judge, (dissenting).   I have not been able to concur in the opinion of the majority of the court delivered in this case.   The original complaint was filed by the executors of one C. C. Graham, deceased, for the purpose of avoiding certain trust deeds existing against the lands of Lanier, in order that the executors might realize, by legal process, the amount of a judgment held by them, it being alleged that the property of appellant was incumbered to its full value.   But the Grahams have not appealed, and the cause proceeds here as if originally brought by appellant; he having filed a cross-complaint, to which Austin Corbin, the Corbin Banking Company, the Union Mortgage, Banking & Trust Company, as well as all the defendants to the Graham complaint, saving himself, were made parties defendant.   In his cross-complaint, appellant attacked all save one of the incumbrances mentioned in the Graham complaint, on the ground of original usury; charging also that the indebtedness therein named had been fraudulently, and by coercion,

augmented against him, and that he had paid large sums thereon for which he had not received credits. Appellant further charged that appellee Union Mortgage, Banking & Trust Company, which likewise filed a cross-complaint, was the holder of the last of the series of usurious incumbrances, which last was and is but a consolidation and renewal of all the incumbrances on his property, including one not originally usurious. The allegations as to usury were all substantially denied by the Union Company; and on the hearing a decree was rendered, as prayed by the Union Company, for its debt, and for foreclosure of the said last incumbrance, and, as to the lien of the Graham judgment, the Union Company was subrogated to the rights of the antecedent mortgagees, and the antecedent mortgages were enforced for its benefit, it being alleged that they had been expressly kept alive, by agreement of the parties at the time of the execution of the last incumbrance, for the protection of the holder thereof.

The record in this case is exceptionally large, owing, as it seems proper to say in passing, to the needless length of the pleadings; one, of many but little shorter, occupying fifty pages of typewritten legal cap. To say that the pleadings abound in argumentative matter, trenchant rhetorical sentences, and other redundance, is not, perhaps, paying a clearly doubtful tribute to that zeal which, within proper limitations, should mark the conduct of every faithful solicitor. It must suffice, therefore, if I shall make a substantial statement of the facts upon which this opinion is founded.

The incumbrances involved in this litigation are: (*a*) That of the American Freehold Land Mortgage Company of London, Limited, for $8,600. (*b*) A series of loans, known as the "Dunton transaction:" (1) In 1885, for $1,500; (2) in 1886 for $7,200; (3) in 1887, for $2,500; (4) in 1888, for $3,000; (5) in 1889, for $6,000; and (6) in 1890, for $3,000. (*c*) The Sherman debt, made in 1882, for $5,000. (*d*) The Hirsch Bros. debt, dated in 1889, for about $10,000. (*e*) Three notes for $10,000 each, and one for $1,792.84, made March 26, 1891, to the Real Estate Mortgage Company, of Maine. Each of the debts named in the foregoing series was secured by a trust deed. (*f*) A loan of $1,500 dated May 26, 1891, made by the Corbin Banking Company, also secured by trust deed.

Appellant's contention as to usury is (1) that all these transactions, except the Sherman transaction, were originally tainted with usury; (2) that all the notes antedating the transaction with the Maine company of March 26, 1891, including the Sherman transaction, were owned or controlled by the Corbin Banking Company, and by the transaction of March 26, 1891, were consolidated and renewed, thus sterilizing that transaction with their usurious taint. There seems to be no disagreement between the parties as to the propositions that if any of the antecedent notes were usurious, and the transaction with the Maine company was a renewal of them, all would be vitiated, but that whether that transaction was or was not a renewal is immaterial unless some one or all of the antecedent debts be found to have been stricken with the fatal disorder. It is agreed also that if the transaction with the Maine company was in good faith an independent loan, as appellee maintains, by means of which the old indebtedness, though usurious, was liquidated, the new loan goes unaffected with any of the virus of the old.

However, appellant's plea of usury has, it appears, a double aspect. He not only pleads usury under the laws of Arkansas, but he further sets it up under the laws of the State of New York, as follows: "Defendant, Lanier, here specifically states and charges that the notes of date March 26, 1891, and all prior notes merged into them, were and are payable at the office of the Corbin Banking Company, in the city and State of New York; that under the laws of the State of New York, as they then existed, and as they now exist, all contracts whereby a greater rate of interest is reserved or charged for forbearance in excess of seven per cent. per annum are declared illegal and void, and the penalty for an infraction of said laws is total forfeiture of both principal and interest; and defendant, Lanier, as well by answer as by cross-complaint, inasmuch as New York is designated as the place of performance, here specifically and specially pleads the laws of the State of New York in discharge of the usurious and void notes under said laws of the place of performance."

It is to be noted that no objection was taken below on account of repugnance, nor were these allegations in any wise

answered; so the unvarying rule is that the record is to be taken here as we find it. *American Freehold Land Mortgage Co.* v. *Sewell*, 15 L. R. A. 229. Appellee insists here that no answer was required, (1) because the laws of New York are not set out *in haec verba*, and (2) because it is not alleged that the notes were made in New York. In so far as the pleadings may be indefinite or uncertain, the objection should have been taken below by motion, for the allegations appear to be substantially sufficient. Under the code, which was designed to sweep away the vexatious niceties of the old system, it is only necessary to state the facts in ordinary and concise language, with such certainty as will fairly enable the court to know what is meant; and in that sense the foreign law in this case is but a fact. Sand. & H. Dig. §§ 5761, 5764; Green, Pl. & Pr. § 877; *Bushey* v. *Reynolds*, 31 Ark. 657. And the allegation that the notes were expressly payable in New York carried with it the legal presumption, in the absence of anything to the contrary, that the laws of that state furnished, by agreement of the parties, the standard of obligation. It must then inevitably follow that, in legal effect, appellee, by failing to deny the allegations of appellant setting up usury under the laws of New York, confessed that the notes were void under the laws of that state.

Still the anomaly remains that the positive testimony of appellant himself to establish his plea under the laws of Arkansas refutes the presumption mentioned, and establishes the fact that the parties elected the laws of this state as their standard of obligation. In all the trust deeds there is a provision that "the notes shall be construed by the laws of Arkansas where they are made." The notes and mortgages were, however, while expressly payable in New York, formally delivered for convenience merely in Memphis, Tennessee. Appellant lived near that city, and did his business there. The parties with whom he negotiated these various loans had selected Memphis as their base of operations only because it is a commercial center convenient to those parts of Arkansas and Mississippi in which it was proposed to carry on the business of making farm loans. Part of the notes were dated in Arkansas, and all the circumstances indicate that the parties intended this

state as the *locus contractus* as well as *locus solutionis*. It seems to be the case of citizens of different states, temporarily in a foreign state, contracting with reference to the laws of the domicile of one of them, but stipulating that the contract shall be performed for convenience in the state of the domicile of the other. In contracts, effect is to be given to the intentions of the parties, in so far as such intentions do not contravene the rights of others, or good policy, or the law itself; and the doctrine of election, as understood in private international law, is limited only by such contravention. The doctrine has, of course, no application in the case of a contract both made and to be performed in a particular state, between persons there domiciled, or between one domiciled and a foreigner; for, upon obvious principles growing out of the rights of independent sovereignties, such contracts are conclusively presumed to have been made with reference to the laws of such state. *Bank of Harrison* v. *Gibson*, 60 Ark. 269.

Following the rule of intention, the law, in principle and upon the authorities, seems to be that where, between citizens of different states temporarily in a foreign state, or in the state of the domicile of one of them, a contract is made, they may elect as their standard of obligation the laws of the state of either of their domiciles; and, where such contract is expressly to be performed in the state of the domicile of either transient contractor, or, if made in the state of one of their domiciles to be performed in the state of the domicile of the other, the law will presume,—but only in the absence of other proof of intention,—that the contract was made with reference to the laws of the place of performance. Bishop, Cont. § 1388; *Cockle* v. *Flack*, 93 U. S. 344.

As to the notes of March 26, 1891, for $41,972.84, made to the Real Estate Mortgage Company, appellant insists that under the evidence, even upon the part of appellee, they, at least, were both made and payable in New York, and are purely New York contracts, under the rule laid down in *Bank of Harrison* v. *Gibson, supra*. And if such testimony is to be taken alone, and absolutely veritable, the result contended for would follow; for it seems the chief office of the Maine Company was in New York; and from the evidence upon the part of appel-

lee it would appear that Austin Corbin there, acting for appellant, negotiated this loan; that Watson, the attorney for Corbin, and also acting for appellant, procured the execution of the papers at Memphis, and forwarded them on to New York for delivery, where, as seen, they were also payable. This, if true, as I have said, would fix the character of these particular notes as purely New York contracts. But, for reasons that will appear further along, I think Austin Corbin and Watson were acting in this matter, not as the agent of appellant, but for the Corbin Banking Company, the real beneficiaries of these notes.

Under the laws of Arkansas, then, are these notes or any of them invalid for usury?

After a most careful consideration, I have reached the opinion that they are all void, either for original usury, or for consolidation and renewal with debts primordially tainted.

The $8,600 loan made by the Freehold Company is clearly ruled by the case of *Banks* v. *Flint*, 54 Ark. 40. In that case this court said: "To sustain the plea of usury it must appear that excessive interest was paid to the lender, or that a bonus or commission was paid to the agent of the lender, with his knowledge, or under circumstances from which his knowledge will be presumed, which commission, when added to the interest paid or to be paid to the lender, would exceed the lawful rate."

The facts in this case are much like the facts in that: Appellant, Lanier, owned, it seems, about 6,000 acres of land in Mississippi county. In February, 1883, he applied for a loan of $8,600, at Memphis, Tennessee, to one F. W. Ocobock, the agent at that place of a New York firm known as the Corbin Banking Company. The terms upon which he was authorized to loan money was by Ocobock fully explained. Appellant was informed that, in addition to signing a blank form of application, he would be reqnired to sign, and he did sign, a form of contract declaring Ocobock his agent in the negotiations for the loan, and agreeing to pay the agent a twenty per cent. cash commission. Thereupon appellant executed his notes, one for $8,600, payable in five years, and five interest coupon notes, one payable each year, calculated on a basis of eight per centum on the principal sum. At the instance of Ocobock, these notes were made payable, however, to the American Freehold Land

Mortgage Company of London, Limited; and to secure the same a mortgage was executed to J. K. O. Sherwood, of New York, Trustee. The evidence shows that, up to the time of the execution by Lanier of the notes and the mortgage, he had no knowledge of Sherwood or the Freehold Mortgage Company, nor had they of him. Immediately upon the execution of the securities, Ocobock drew a check on a Memphis bank in favor of Lanier for $6,780; the remainder of the loan, $1,820, going in satisfaction of the contract for commissions, and for some matters of expense connected with the loan. Ocobock was at the time receiving from the Corbin Banking Company a salary of $600 per month for negotiating loans, and the twenty per cent. commission exacted of Lanier by him was retained by this bank. At the date of the loan, Austin Corbin, an active member of the Corbin Banking Company, owned 1,502 shares of the stock of the Freehold Company, and the Corbin Banking Company was extensively connected with the negotiations of loans of money in the United States belonging to the Freehold Company, placed with the bank for that purpose. A representative of the Corbin Bank and the secretary of the Freehold Company testify, however, that neither the Corbin Banking Company, nor any person connected with it, represented the Freehold Company in the negotiations of such loans; and this brings me to an examination of the facts and circumstances in evidence tending to establish or disprove the truth of their statements. There is in evidence what purports to be a copy of the charter of the Freehold Company. Appellee objects, however, in this court, for the first time, to the consideration of this copy as evidence, upon the grounds that (1) it is not properly authenticated, and, second, no part of the *res gestae.*

Two persons signing as directors certify that the copy in evidence is a true copy of the charter, and acknowledge before the consul general of the United States of America, at London, that they have the right to certify. A properly proved copy of the charter of the Freehold Company, in so far as any of its provisions tend to establish usury, would be evidence against that company in a case of this character; and I can see no reason why such a copy is not to the same extent admissible against appellee. *German Bank* v. *Deshon,* 41 Ark. 331.

And if the copy in evidence is not properly authenticated, that objection, to be considered here, must have been called to the attention of the lower court. *Woodruff* v. *Core*, 23 Ark. 341; *George Campbell Co.* v. *Angus*, 22 S. E. 167; *Robinson* v. *Dewhurst*, 28 Fed. Rep. 336. From the copy in evidence it appears that the Freehold Company was organized in England, under the companies act (24 & 26 Victoria), for the purpose of making loans throughout the United Kingdom and in the United States, with a principal office at London. Article 58 of the charter provides for the election or appointment of various officers, denominated "directors," "auditors," "managers" and "bankers," and that these officers may be elected or appointed either within or without the United Kingdom. The office of banker, by another provision, is made custodian of all moneys and other property from time to time entrusted to it. It is provided further that the person holding the office of banker may be removed at any time, or other bankers appointed to act with him. Article 117 empowers the directors to appoint local agents in the United States. Another provision is to the effect that the directors may from time to time delegate to local boards, local directors, manager, commissioners, and other officers, such of the powers conferred on the directors as they may consider requisite, with power of revocation at will.

From the nature of the business of extensively negotiating loans on land mortgage security, there are many most essential details which cannot, upon any correct business principle, be entrusted to the borrower; and the charter of the Freehold Company manifestly contemplates that these details are to be in charge of its own officers. Nor is it unreasonable to assume, if there were no evidence on the subject, that the Freehold Company assigned to one of the principal fields of its proposed operations the agencies contemplated by the charter as essential to the success of the enterprise. There are inherent difficulties attending investigations of this nature which render it impracticable to say, with the highest moral certainty, that such agencies are established in a given manner; but that the Corbin Banking Company, and the individual members of that firm, performed the functions of banker, general manager and directors of the Freehold Company in the United States, finds ample

warrant in the testimony.   The Corbin Banking Company and its officers, through local agents to whom they paid high salaries, reached borrowers in all parts of the country for the Freehold Company.   The bank superintended all the details, and furnished the requisite legal blanks, framed so as to protect every interest of the lender at the expense of the borrower.   The bank approved the loan, paid out the money, and collected it as it fell due, sued borrowers who made default, and looked after the loans generally as a shrewd business man is expected to look after his own interests. Moreover, an allegation made by appellee in its cross-complaint, in view of the rule that in the construction of pleadings everything is to be taken most strongly against the pleader, is not without significance.   Appellant having charged that the Freehold Company had been doing business in Arkansas in violation of the law applicable to foreign corporations, appellee, after averring that the Freehold Company had not done business in this state, further averred that the loan made to appellant by such company was made, and all the negotiations therefor carried on, in the city of Memphis in the State of Tennessee.   It is nowhere disputed that the loan was made through Ocobock in Tennessee, and that he, and not another, there conducted all the negotiations with Lanier.   The notes and mortgage were delivered by Lanier to Ocobock in Memphis, and there Ocobock gave to Lanier the check on a Memphis bank.   Confessedly, no one, unless Ocobock, represented the Freehold Company in that state.   True, appellee denies, on information and belief, that Ocobock was the agent of the Freehold Company, and alleges that, under written contract between them, he was the agent of appellant; how then could the loan have been "made," and all the negotiations therefor carried on, in the city of Memphis, in the State of Tennessee," as appellee has alleged?   To have been "made," the negotiations must have been "carried on" or consummated with some representative of the company.   The tranaction was complete only when the papers were delivered and the money or its representative received thereon.   It scarcely needs to be stated that nothing Ocobock or appellant could have done in Tennessee would have bound the company until the papers had been received and accepted by its home office, or by its New

York agent, unless Ocobock really represented the company in Tennessee, and his claim to represent appellant was a mere pretext. It follows that to say that "the loan was closed up in Tennessee" is to admit that Ocobock was the agent of the company. Furthermore that the Freehold Company knew, or should be charged with knowledge, that the Corbin Bank, through Ocobock, was exacting of borrowers commissions which, added to the rate of interest reserved in the face of the loan, exceeded ten per cent. per annum does not admit of reasonable doubt. It is in evidence that neither the Corbin Bank nor its local agent, Ocobock, received any compensation from the Freehold Company for services of which it received the benefit. It is immaterial whether the Freehold Company received any part of the twenty per cent. commissions. Section 12, article 29, of its charter provides that the remuneration of the directors shall be £1000 per annum, to be increased to and remain at £1500 per annum when and so long as a dividend of ten per cent. per annum shall be paid; and to be further increased to and remain at £2000 per annum when, and so long as a dividend of fifteen per cent. per annum shall be paid. If these provisions do not manifest an intention or expectation that the profits of its loaning business, conducted through its various agencies, would exceed ten per cent. per annum upon the money invested, over and above all expenses, then the language of the charter upon this subject is wholly without significance. And, without a full discussion of the voluminous evidence tending to establish knowledge, upon the part of the Freehold Company, that its agent, the Corbin Bank, exacted through Ocobock an excessive rate of interest, the drawing of the check by Ocobock for $6,820 in satisfaction of a loan for $8,600, which check appears to have been paid without question by the Freehold Company, is sufficient notice to the company, even if it had not previously authorized it, that its agents were exacting excessive bonuses on loans; and acquiescence under these circumstances, I am impelled to hold, has ratified the act.

There are now to be considered a series of loans made in the name of one F. W. Dunton. It seems that in the year 1885 B. J. Martin had succeeded to the Memphis agency of the Corbin Banking Company, and in the early part of that year

he, at the instance of the bank, called upon Lanier for the purpose of collecting the past-due interest on the Freehold debt. Lanier was then unable to meet these payments, and needed more money. Martin proposed to make him a new loan of $1,500, and accordingly Lanier executed his note for that sum, but, at the instance of Martin, to F. W. Dunton. And each year thereafter, up to and including 1890, Martin negotiated a similar loan, except as to the amounts. All the Dunton loans aggregated about $21,700. They were severally secured by trust deeds upon the lands of Lanier, in which deeds W. G. Wheeler was named as trustee. The evidence discloses that in each case the Corbin Banking Company was the real lender, and that Dunton and Wheeler were members of that firm. Before Martin proposed the loan in 1885, he had exacted and obtained of Lanier a writing surrendering his plantation to Sherwood, trustee in the Freehold loan, with the understanding that Martin, as agent of Sherwood, would at once lease the plantation to Lanier, which was accordingly done under a stipulation that the rental should be paid upon the Freehold loan. To the note given for $1,500 in 1885 was attached an interest coupon for $106.25, the principal note being payable January 1, 1886. Indeed, all the Dunton notes bore interest at the rate of ten per cent. per annum from date till paid. The respective sums for which the notes severally called were not paid to Lanier, however, when the notes were delivered to the agent; the only consideration received by Lanier being paid in installments of money and supplies from time to time during the year. Occasionally Lanier purchased supplies himself, and made requisition on Martin for the money to pay for them, but generally Martin purchased them upon Lanier's orders, and forwarded them to him. In any event, Martin invariably sent the original invoice to the Corbin Banking Company, where a profit was charged to Lanier upon the price of the supplies, notwithstanding the notes given for the loan drew ten per cent. interest per annum from date till paid. The first loan made by Martin (that of 1885) was evidently treated by the parties as exhausted when the installment received by Lanier reached $1,390; for at that time Lanier, through Martin, borrowed from the Corbin Banking Company a further sum of $500, needed to erect a gin, and Martin, after pur-

chasing the gin at a cost of $270, upon which purchase he retained a commission of $15, delivered to Lanier only $215. The loan made in 1886 was for $7,200, divided into three notes for $2,400 each, payable in one, two and three years, at ten per. cent. interest per annum from date till paid. It seems that upon this loan appellant received in installments only $5,519.34. Part of the balance was retained by the Corbin Bank, without appellant's consent, to satisfy a charge it had made against him in the sum of $1,371.44, which was on account of a payment made by the bank, against appellant's consent, of a tax illegally assessed against his lands, and for which it had been illegally sold. The bank evidently thought the payment necessary to protect its own securities, but appellant was at the time resisting the payment of the tax, and seeking to avoid the illegal sale by legal proceedings, in which he finally prevailed. For the note and mortgage given in 1889 for $6,000, appellant received no consideration whatever from Dunton or the Corbin Bank. These papers were executed at the instance of Martin, and appellant continued to receive advancements of money and supplies as usual, as he thought, until September following, when, for some reason which the testimony does not make clear, Lanier learned for the first time that these installments were coming from Hirsch Bros., a Memphis firm of merchants, and not from Dunton, as Lanier supposed. As to this loan, appellee states in its brief that, "at Martin's suggestion, Lanier, early in 1889, had executed a trust deed and notes for $6,000 in favor of F. W. Dunton, under the impression that the Corbin Banking Company would continue to furnish him money and supplies, as it had been doing, and that for several months he believed they had been doing through Hirsch Bros.; but in September, 1889, Hirsch Bros. informed him that they were making those advancements on their own account." Not far from the time Lanier "received this information," Dunton assigned the notes and mortgage for $6,000 to Hirsch Bros., and it seems that Lanier executed an additional note and mortgage "to secure $8,000 already advanced and $1,200 to be advanced." In September, 1890, Hirsch Bros. claimed that Lanier's indebtedness to them amounted to about $10,892.52, upon which they sued at law, and also sought in equity a foreclosure of their

mortgages. With Lanier, they made Dunton a party to the suit in equity, charging that they were acting for the latter in making the advances to Lanier. In this connection it is proper to state that, whilst that suit was pending, several thousand acres of Lanier's lands were advertised to be sold under the power in a trust deed which he had executed in 1882 to Alma C. Sherman for note and interest amounting to $5,000. Meanwhile Martin, acting for the bank, claimed to Lanier that his indebtedness was greater than he had supposed. Circumstances had arisen from which the bank seem to deem it necessary to take precautionary steps in view of a possible plea of usury on the part of Lanier. To that end correspondence passed between Martin and the bank; and one W. J. Kelley, a New York attorney of the bank, came on to Mississippi county to effect such an adjustment of Lanier's indebtedness as would result in the least loss to the bank. Kelly bought the Sherman debt at a discount of $1,000, and a little later he bought the Hirsch Bros. debt at a discount of $2,500, and the notes and mortgages were assigned to him in trust for the bank. Whilst these matters were transpiring, Martin, under the advice from the bank, was impressing Lanier with the idea of negotiating "a new loan on long time for a sufficient sum to pay off all the antecedent incumbrances on his property." The purchase of the Hirsch debt, which was on the 19th of March, 1891, gave the Corbin Bank control, as owner or otherwise, of all of Lanier's mortgage indebtedness, which the bank claimed aggregated $41,792.84. At this juncture, Watson, another attorney for the bank, to use his own language, "informed Lanier that, to enable him to pay his indebtedness, the Real Estate Mortgage Company agreed to lend him that amount of money for five years at eight per cent., payable annually, secured by trust deed on his entire lands." Lanier did not know the Real Estate Mortgage Company; and it is plain from the evidence that it had never seen or heard of him. The Corbin Bank had previously sent to Watson for adjustment all the indebtedness held by it against Lanier, including the Freehold debt; and on March 26, 1891, Lanier executed to "the Real Estate Mortgage Company," through Watson, his note for $41,792.84, with trust deed upon all his lands, to one Hinsdale, of New York, trustee.

And at the time the papers were delivered to Watson, it was expressly understood between him and Lanier, at the suggestion of Watson, that all the antecedent incumbrances, except the Freehold incumbrance, which was to be paid off and cancelled, were to be kept alive and assigned to the Real Estate Mortgage Company for its protection and better security. Whereupon Watson drew his check in favor of Lanier upon the Real Estate Mortgage Company for $41,972.84, which Lanier indorsed, and Watson inclosed to the Corbin Banking Company, with Lanier's instructions to "collect and apply the proceeds to the payment of the said debt."

The evidence discloses that the Real Estate Mortgage Company is a Maine corporation. It was organized in February, 1891, but its certificate of incorporation was not filed in the proper office in that state until the 7th day of April, 1891, eleven days subsequent to the date of Lanier's note for $41,972.84. This company appears to have been organized entirely by residents of New York; indeed, mainly by members of the Corbin Banking Company. Manifestly, the purpose of its organization was, as it was expressed by Martin in his evidence, " a desire on the part of the Corbin Banking Company to take up old Arkansas loans and make new ones, apparently through some entirely disinterested party, upon a ten per cent. basis, and thus take them out of the danger of a suit for usury." It is to be observed that the capital stock of the Real Estate Mortgage Company was divided into 1,000 shares of the par value of $100 each. Of this stock, Austin Corbin subscribed for 430 shares; Hanna M., his wife, for 90 shares; Anna W. and Austin, jr., his children, for 40 shares each; Austin Corbin, trustee, for 105 shares; Isabella C. Eggell, a daughter of Austin Corbin and wife of a member of the Corbin Bank, for 40 shares; W. J. Kelly (attorney for the bank), Frank M. Kelly, and E. R. Reynolds, for one share each; Charles Pratt & Co. for 250 shares; Benjamin Norcon and Charles M. Pratt, for one share each. Frank M. Kelly, with one share, was made president. The office of this company was in New York City, and, as seems certain, in the office of the Corbin Bank. The certificate of incorporation, which, as shown, was filed eleven days after the date of the

Lanier notes and mortgage, made, as has been seen, to "The Real Estate Mortgage Company," discloses that only $300 of the capital stock had been paid in. And if this mortgage company ever transacted any other business besides making this loan to Lanier (if it may be so termed) for a sum nearly equal to half of its capital stock, the fact is not satisfactorily shown by the record. And while F. M. Kelly, W. J. Kelly and E. R. Reynolds nominally constitute the board of directors, the circumstances show to my mind most convincingly that the affairs of the company were wholly under the control of the Corbin Banking Company. The officers of the Real Estate Mortgage Company knew nothing whatever of Lanier, nor of his securities or their value. Indeed, as to these matters, this company, according to its secretary's statement, relied wholly upon the representations of Austin Corbin; and, as illustrative of the nature of the transaction, the evidence of Kelly, President, is not without bearing. According to Kelly, who contradicts Watson, this company would not invest in these securities until Austin Corbin had assured its officers that he would "find a buyer in a short while" to take the paper off their hands. Thus the Maine company, as he says, was induced to make the loan "temporarily." President Kelly explains that the loan at that particular time was, on account of its size, not desired by his company, as a permanent investment, although Watson had " informed Lanier that the company had agreed to make the loan for five years at eight per cent.," and although President Kelly seems to stress the statement that his company made even the temporary investment solely for the interest that would accrue thereon. In view of the professed mission of the Maine company to negotiate and handle this class of securities, President Kelly might well have particularized wherein so large a loan was less desirable than a number of small ones whose aggregate, saying nothing of the expense of numerous negotiations, required an equal expenditure. In what way Austin Corbin kept faith with the Maine company, and "found a buyer," is now to be seen. On the 25th day of June, 1891, about three months from their date, these securities were transferred to appellee. The negotiations were conducted entirely by Austin Corbin, who assumed

throughout to be the sole owner of the paper. At some time prior to the transfer to appellee,—and at what time no one seems to know or is willing to tell,—the Maine company indorsed the paper, but without date and without recourse. At the time of the transfer from the Maine company to appellee, some $800 of interest had accrued; and yet, according to the secretary of appellee, his company paid the face of the notes only, leaving the accrued interest, as it is said, "for subsequent adjustment." Moreover, as a condition of its acceptance of the paper, appellee required and was given the written guaranty of the Corbin Banking Company, covering the principal and seven per cent. interest from the date of the notes. Thereupon the transaction was closed by debiting the account of appellee on the books of the Corbin Bank with the face of the note.

Still a further, and the last, transaction between appellant and the Corbin Bank, and in which appellee has no interest, is to be noticed. It is a note and mortgage executed May 26, 1891, for $1,500 to the bank, likewise attacked for usury. The note was made to draw ten per cent. interest per annum from date till paid, but the money was to be paid, as in the Dunton transaction, in installments from time to time during the year. To the allegations of the cross-complaint upon this note, neither the Corbin Banking Company, Austin Corbin, nor any one for them, or any of them, answered or in anywise pleaded. It is developed in evidence, however, that there was an understanding at the time the loan was made that the money was to be retained by the bank, and paid to appellant from time to time, but only upon the approval of Watson, the bank's agent. It is clear that the money was never at the free disposal of appellant.

It is the contention of appellee that the notes and mortgages in the Dunton series do not reflect the real contracts between the parties, that they are only forms of security for advancements of money and supplies agreed to be made from time to time as appellant should call for them, and that interest was charged only upon the amount of each advancement from its date. But in my opinion the evidence is far from consonant with that contention. In the case of the $1,500 loan made in 1885, appellant received, as stated, only $1,390 in installments,

while he was charged on the books of the bank with the full face of the note. The loan of 1886 for $7,200, consisting of three notes for $2,400 each, was made in renewal of the loan of 1885, and to pay off the interest coupons then due on the Freehold loan, and for some additional money. There is no evidence that the parties had an understanding that interest would be charged only upon the sum of each advancement from its date; but appellant and Martin, the bank's agent, both testify substantially that the notes and mortgages express the only direct understanding as to interest between the parties. Moreover, there is an unqualified concession that the Corbin Bank secretly charged a profit on the advancements of supplies. But appellee stresses the evidence of witness Watson that, as soon as appellant learned of these secret exactions, they were eliminated from the final aggregate claimed by the bank. Furthermore, the argument is advanced that the manner of these exactions, the element of secrecy, saves them from the taint of usury; that usury can only be predicated upon a corrupt agreement between the parties. "You can not," it is declared illustratively, "charge a man with one crime and convict him of another." But the true proposition seems to be whether one charged with usury may escape the consequences of his illegal and unconscionable exactions by showing that the manner of them was so stealthful as to constitute an essential element in one of the indictable felonies. Usury laws are punitive. They are leveled at the lender. No shift or device will be allowed to evade them, but the courts should disregard mere forms, and examine into the real nature of the transaction. Knowledge or assent upon the part of the borrower is wholly immaterial. It has been recently and very clearly so decided by this court in an able opinion delivered by Battle, J. *Garvin* v. *Linton*, 62 Ark. 370. Under our statute the usury may be taken "upon the contract," which of course implies the assent of both parties; but by the same statute the illegal exactions may be usurious if made by the aid of the contract, as in the case at bar, when the knowledge or assent of the borrower is immaterial. It does not, however, become necessary in this case to pass upon the question whether the simple charging of profits secretly in excess of the maximum legal rate of interest would

constitute usury. Such acts nevertheless manifest the usurious disposition; and this, taken with all the facts and circumstances, convinces me that this entire system was but a plan devised by the Corbin Banking Company, and understood, in most of its features, by Lanier, whereby the lender was to be remunerated in excess of the legal rate of interest for the use of his means. Appellant doubtless did not know that he was being charged these profits, and, if not, of course he did not directly agree to such charges; but he did know, during a series of years, that he was giving his notes at ten per cent. for sums that were to be paid in installments; that by the plan adopted the lender would get interest in excess of the legal rate, and the manner and amount of it were left largely to the latter. A banking institution may, in emergencies, doubtless depart from the usual custom of banking, and take upon themselves the task of furnishing to a planter his annual supplies, not only of money in varying amounts, but farm necessities, provisions, stock, seed and the endless number of miscellaneous articles constantly demanded by the business of planting; but such departures are doubtless rare, nor is it to be supposed that they will be persisted in for a period of five years unless there is an incentive looking to interest beyond what might be lawfully realized by the more ordinary and direct methods for investing bank capital. A single transaction of the character in question might be susceptible of explanation consistent with legitimate purpose; but here are a number of transactions all interlocked, and attended with clear marks of unity of design to evade the law. The law looks to the substance, not to its ingenious covering; and where there is, in substance, a loan of money for a pecuniary benefit, in any form, in excess of the legal rate of interest, by no scheme or plan can the transaction escape the blight of usury; but it settles over all, upon leaf and branch, filtering into the sap, carrying death to every part.

Nor has the transaction of March 26, 1891, escaped the common taint. It is, I hold, clearly shown to be but a consolidation and renewal of all antecedent ones. It matters not, I think, under the facts of this case, that the Real Estate Mortgage Company, to which these notes were nominally made, is a corporation. It is shown to be one in name only, for, beyond

reasonable question, it is and was the mere creature of the Corbin Banking Company, organized by that concern for the manifest purpose of taking up old usurious loans, and renewing them in its name, so as to make it appear that there was a new lender to the old borrowers of the bank, and that fresh funds had liquidated the usurious indebtedness; whereas the whole is seen to be, if not the clever juggle of an expert, nevertheless a wileful device of those who well understood the countless methods of the usurer. *Davis Improved Wrought Iron Wagon Wheel Co.* v. *Davis Wrought Iron Wagon Co.*, 20 Fed. Rep. 700 ; Cook on Stockholders, § 663*a; First National Bank* v. *Plankinton*, 27 Wis. 177; *Lukens* v. *Hazlett (Minn.)*, 35 N. W. Rep. 265.

Corporations are often organized to act, as I think this one was, as a cloak for fraud; and certainly it is the very highest province of the courts in all such cases to disregard the corporate existence, in so far as the ends of justice may demand, to circumvent the fraud.

Finally, that the notes under consideration are void in the hands of appellee, even if an innocent holder (and it is not), is ruled by the case of *German Bank* v. *De Shon*, 41 Ark. 331.

I have now reached the last question presented by this voluminous record. In his cross-complaint appellent charged against the Corbin Banking Company, and the individual members of that firm, that the transaction of March 26, 1891, was fraudulent, and superinduced by compulsion and coercion on the part of the bank. It was further specifically charged that he had paid large sums on the antecedent indebtedness, for which he had received no credits. The payments thus made are particularly pointed out. It is also alleged by appellant that he relied upon the bank to keep a correct account of his various payments, and that, at the time of the execution of the notes of the last named date, he was misled, as to the true state of his affairs, by the concealments and frauds of the bank. The payments which appellant alleges that he paid the bank aggregate $27,729.14. From the record there is no question that, in the settlement of March 26, 1891, he was credited with payments only to the amount of $10,007.68, leaving a difference of $17,722.46, which does not include the $1,371.44, tax money

wrongfully withheld as shown.   Now, as I understand the opinion of the majority in this case, appellants claim for these credits comes too late.   Too late for what?   Too late, as I understand the opinion, as any kind of defense or set-off against the notes in the hands of appellee, held to be, by the court, an innocent holder.   But the allegations of appellant are not made for the purpose of defense against the notes.   They are not made against appellee.   They are specifically charged against the Corbin Banking Company, and the individual members of that firm.   Nor were these allegations, thus specifically made, answered or pleaded to in any manner.   If it is replied that the bank and its members were non-residents served by publication, against whom, therefore, a personal judgment could not be taken, I reply that they filed a demurrer at an early stage of the proceeding.   Besides, the decree of the lower court recites the presence of all parties.   But the demurrer did not relate to the sufficiency of the allegations under consideration, and I hold that they are sufficient to entitle appellant to a decree by default against the Corbin Banking Company.

The decree of the lower court ought to be reversed, the securities held void for usury, and appellant ought to have a decree for the sum of $17,722.46 by default against the Corbin Banking Company, and the individual members of that firm.

WOOD, J., concurs in the dissenting opinion.