William Roger WINKLE et ux *v.*
GRAND NATIONAL BANK

78-296                                          601 S.W. 2d 559

Substituted Opinion on Rehearing
delivered April 21, 1980

124

Appellant, *pro se*.

*Robert S. Hargraves,* for appellee-cross appellant.

JOHN A. FOGLEMAN, Chief Justice. This action was commenced by appellee and cross-appellant Grand National Bank against appellants on two promissory notes executed by them on November 5, 1975. They were: a short term ninety-day note in the principal amount of $15,000, with interest at ten percent, renewable at maturity with an eight percent reduction in principal, and a note for the principal sum of $22,000 with ten percent interest to be paid over ten years in one hundred twenty equal installments. Appellee's loan clerk prepared the notes, a deed of trust, a security agreement and a financing statement using the total proceeds of the two notes as the total amount financed and excluding any charges for credit life insurance.

Several errors were made in the preparation of the documents. The deed of trust and the security agreement prepared by the loan clerk referred to only one promissory note for $37,000 and were therefore incorrectly drawn, a fact overlooked by both parties at the time. At the closing, appel-

lants requested credit life insurance on both promissory notes. This required an additional advance of funds, but appellee's loan officer, instead of preparing new documents, tried to make corrections on the face of the notes. These corrections were initialed by Roger Winkle. The amount of the monthly payments in the body of the installment note, however, was not changed to correspond to the adjustment made for the credit life insurance until the discrepancy was discovered at the close of the appellee's business day. The total amount recited as due in the body of the installment note was not corrected. Soon after the notes were executed, appellants received a payment book showing payments which had been increased to cover the amount of the premium for the credit life insurance as a part of the principal. Appellant made these payments for approximately one year in the amount shown in the coupon book, rather than the amount of the lower installment payments indicated in the note.

The Winkles subsequently defaulted on both promissory notes and, on May 5, 1977, the bank brought this suit to collect the balance due on them. The bank, having discovered the errors in the documents, sought reformation of these instruments as well as judgment for the balance due on both notes and foreclosure of the security instruments. Appellants' answer was a general denial but they filed a counterclaim and an amendment thereto, alleging that appellee had violated the Truth in Lending Act and that the loan was usurious. They also sought to recover actual and punitive damages, alleging that the bank's officer had willfully, maliciously, and intentionally misled them in the transaction. The chancellor found that: the Winkles desired to borrow funds sufficient to refinance outstanding obligations and to provide additional capital for their business, Winkle Handbag and Fabric Center; because the loan was primarily (even overwhelmingly) for business purposes, the bank was not required to comply with the provisions of the Truth in Lending Act; the instruments should be reformed to describe the intentions and agreement of the parties; and the $22,000 installment note was usurious. Because appellee is a national bank and, therefore, subject to federal regulation, the judgment rendered for appellants was in the amount of

twice the interest they had paid on the $22,000 note. Appellee bank was awarded the balance due on a renewal of the $15,000 note and the remaining principal of the $22,000 note, less interest and the credit life premium.

Appellants rely upon five points for reversal:

## I

THE CHANCELLOR ERRED IN NOT FINDING THE ENTIRE LOAN TRANSACTION USURIOUS BY EXCLUDING THE $15,000 DEMAND NOTE.

## II

THAT THE CHANCELLOR ERRED IN NOT VOIDING THE $22,000 INSTALLMENT NOTE.

## III

THE CHANCELLOR ERRED IN FINDING THAT A MUTUAL MISTAKE OF ERROR TOOK PLACE IN THE PREPARATION OF A DEED OF TRUST.

## IV

THE CHANCELLOR ERRED IN EXEMPTING THIS LOAN TRANSACTION FROM THE PROTECTION OF THE TRUTH IN LENDING LAW AS TO THE RIGHT OF RESCISSION.

## V

THE CHANCELLOR ERRED IN SUSTAINING DEMURRER FOR DAMAGES.

Appellee cross-appeals alleging error on three points:

## I

THE CHANCELLOR ERRED IN CONCLUDING THAT THE ACCRUAL OF INTEREST USING

THE "RULE OF 78's" RENDERED THE $22,000 PROMISSORY NOTE USURIOUS.

## II

THE CHANCELLOR ERRED IN CONCLUDING THAT THE USE OF THE "RULE OF 78's" UNDER THE WORDING OF THE PROMISSORY NOTE RENDERED THE NOTE USURIOUS.

## III

THE CHANCELLOR ERRED IN FINDING THAT THE COMMISSION EARNED ON THE CREDIT LIFE INSURANCE PREMIUM RENDERED THE NOTE USURIOUS.

We will first treat appellants' arguments and then consider appellee's three points on cross-appeal.

## I

Appellants, in their pro se brief, argue that not only the $15,000 promissory note, but the whole transaction, was usurious because appellee did not prove at trial that credit life insurance was issued on that note and, therefore, a charge for a credit life insurance premium was actually hidden interest. Appellants also contend that the $15,000 note as renewed on April 13, 1976 is usurious on its face.

Appellee bank, while protesting that this issue was raised for the first time in appellants' post-trial brief, stated that the policy was not introduced at trial because of an oversight of counsel. The record reveals that the foundation had been laid for the policy's introduction into evidence, but two copies of the policy on the $22,000 note were introduced instead and appellee's attorney had misplaced the document in question. Because the attorney felt that the validity of the policy was not at issue at trial, the oversight was never corrected. Appellee attached the policy to its post-trial brief as an exhibit. Even though more than one month elapsed between the filing of this brief and the filing of the chancel-

lor's findings of fact and law, the chancellor obviously considered the policy without objection from appellants. The chancellor found that the original figures typed on the face of the note had been changed, when the Winkles elected to take credit life insurance, to include the amount of the premium $51.75 and the changes had been initialed by Roger Winkle.

Appellants complain that appellee failed to produce this policy in response to a subpoena duces tecum which they had caused to be served upon appellee three months before the trial which was held on October 25, 1977. This subpoena called for appellee to bring all documents regarding the execution of the promissory notes for $22,000 and $15,000 to a hearing to be held on June 28, 1977. Although both parties abstract portions of the record, it is not clear to us whether the hearing was held or its nature, if held. It must have been one of several preliminary hearings mentioned in appellants' statement of the case, one of which was held on June 29, 1977. There is no indication that the case had been set for trial on either date. We find no indication that the subpoena required production of the policy, or other documents at the trial.

Appellee's attorney claims to have been misled into the belief that appellants were not raising any issue as to the credit life insurance until the question was raised in a post-trial brief filed by appellants. A stipulation was entered into on October 19, 1977, which was a week prior to actual trial, although it appears that this may have been the date on which the trial was originally set, because the parties agreed in the stipulation that the Winkles were entitled to a continuance. That stipulation included the following paragraphs:

2. That the defendants' allegation of usury is evidenced by the computerized statement mailed to them by Systematics, Incorporated, which reflects computation of earned interest for the calendar year 1976.

3. That said defendants specifically waived any other allegations of usury as to the time of making of the

promissory notes involved, any demands for payment or any demands made by the pleadings herein.

Appellee and its attorney were cerainly justified in believing that the question of credit life insurance was not an issue until appellants asserted in their post-trial brief that the $51.75 was a masked interest charge because no policy was ever issued.

George Lefler, Executive Vice-President of Grand National Bank testified that a credit life insurance policy was issued, the premium added to the $15,000 principal advanced and interest charged on the total amount financed. Lefler also testified that the credit life insurance was issued by an independent insurance company and the policy issued to the Winkles was in the loan file and still in effect at the time of trial. Mrs. Carolyn Phillips, Assistant Vice-President of Grand National Bank, testified that she took the Winkles' application for credit life insurance. At that time, she claims, she gave Mrs. Winkle a form for a physical examination to be returned directly to the insurer by Mrs. Winkle or her doctor. Mrs. Phillips stated that the habit of the insurance company when it received the physical examination forms was not to notify the bank, and silence was presumed to be acceptance on their part. Mrs. Phillips did not hear from the insurance company and she presumed the Winkles' policy was accepted. Mrs. Phillips also testified that she altered the $15,000 note to reflect the credit insurance.

Appellants also contend that the payments provided for made the note usurious, pointing out that Mike Allen, an accountant called as a witness by the Winkles, testified that he included the credit life insurance premium as principal and calculated the interest allowable on the $15,000 note at 10 percent and found that, considering information statements issued by the bank for the year 1976, there was an overcharge of one cent for that year. He recognized that the statements sent out by the bank were for information purposes mainly to be used by the taxpayer for verification to the Internal Revenue Service as to the amount of interest paid for the year. He also testified that there are untold formulas for computing interest. The Expanded Monthly

Tables published by Financial Publishing Company were exhibited. Neither party abstracted this exhibit, so we cannot show the interest calculations on this note (or its renewals), according to these tables. The note was due 90 days from its date. It was paid by a renewal note dated April 13, 1976. Interest was paid up through the date of this renewal. The renewal note was again renewed on August 20, 1976 at which time interest was paid in full and a reduction made of the principal balance. This note was then renewed on December 17, 1976, when interest was again paid in full and there was a reduction of $600 in principal. It is well known that different methods of interest calculation may produce results that may vary as much as one cent or more, for a one year period, sometimes by the rounding off of odd cents.

Appellants argue that the April 13 renewal shows usury on its face because the interest showed that it was figured for 99 days while the due date indicated in the lower right hand side of the note was July 3, 1976, 81 days from the date of the note. The note was renewed for 99 days. A renewal of this note took place 99 days after its date and there is no indication that the interest paid at that time was excessive. The self-contradictory dates do not, in and of themselves, make the note usurious.

The chancellor found that appellee was entitled to judgment against appellants under the terms of the $15,000 note for the amount of its last renewal on December 17, 1976. We agree. Appellants had the burden of proving usury by clear, satisfactory and convincing evidence. *First American National Bank* v. *McClure Construction Co.,* 265 Ark. 792, 581 S.W. 2d 550; *Arkansas Real Estate Co.* v. *Buhler,* 247 Ark. 582, 447 S.W. 2d 126. This burden they have failed to meet. It is axiomatic that the chancellor's findings will not be reversed unless they are clearly against the preponderance of the evidence. *Gibson* v. *Heiman,* 261 Ark. 236, 547 S.W. 2d 111; *Titan Oil & Gas, Inc.* v. *Shipley,* 257 Ark. 278, 517 S.W. 2d 210.

Appellants also argue that the $22,000 note was usurious on account of credit life premiums charged, but we will treat that question when we consider the cross-appeal.

## II

Appellants contend that the chancellor erred in not voiding the $22,000 note because of appellee's fraudulent and material alteration of this instrument, relying on Ark. Stat. Ann. § 85-3-407 (Add. 1961). Section 85-3-407 provides:

> Alteration. — (1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in
> (a) the number or relations of the parties; or
> (b) an incomplete instrument, by completing it otherwise than as authorized; or
> (c) the writing as signed, by adding to it or by removing any part of it.
>
> (2) As against any person other than a subsequent holder in due course
> (a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;
> (b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given.

Clearly appellants are not discharged unless the alteration is both fraudulent and material, changes the contract of a party thereto and was made without the assent of that party seeking to be discharged. The changes made in the $22,000 note were the result of the Winkles' request for credit life insurance and were reflected with their assent as evidenced by Roger Winkle's initialling of these changes. The subsequent correction in the amount of the monthly payments was merely for the purpose of conforming the payments to the actual agreement of the parties.

We agree with appellants and the trial court that the various errors, discrepancies and corrections rendered the note non-negotiable, but this fact had no effect on the valid-

ity of the note between the parties, even though none of the errors were directly attributable to the Winkles. Carolyn Phillips, who handled the transaction with the Winkles, testified that she had calculated the amount of the monthly payments and had explained to the Winkles that their payments on the note would be $329.97, the correct amount, which was the amount shown in the coupon book sent them two weeks later. Mrs. Winkle said that she called and protested at this time and that Mrs. Phillips said credit would be given if there was any error. Mrs. Phillips said that she could not recall the Winkles voicing any objection. Even though Mrs. Winkle said she mentioned the amount every time they made a payment, the Winkles made these payments by check for a year without noting a protest on them. The name of the unincorporated business of the Winkles was changed to correspond with the name as it was shown on a form previously filled out by the Winkles. We cannot say that there was a preponderance of the evidence to show any alteration of the deed of trust that changed the contract. The contract was for $39,596.40 to be paid in 120 equal installments. The bank simply corrected the error in the amount of the monthly payments to accomplish this agreement. See *Teratron General* v. *Institutional Investors Trust*, 18 Wash. App. 481, 569 P. 2d 1198 (1977); 2 Anderson, Uniform Commercial Code 954, § 3-407:14 (2d ed.) 1971.

### III

Appellants assert that the chancellor erred in reforming the deed of trust because of mutual mistake in its preparation. There were two errors in the instrument: the recitation that there was one promissory note in the amount of $37,000 and the statement that the promissory note was payable in equal monthly installments of $290.74. The chancellor found that the deed of trust was executed by the Winkles as partial security for the $22,000 note; that a mutual mistake and error took place in its preparation; and that the deed of trust should be reformed to describe accurately the note it secured.

According to testimony at trial, the reference to one $37,000 promissory note rather than the $22,000 installment loan resulted from a loan clerk's error in the preparation of

the deed of trust. Appellee's loan officer, Carolyn Phillips, testified that the error occurred when the loan clerk improperly used the total principal amount of the loan to be secured, rather than the amount of the installment note. The second error occurred when appellants requested credit life insurance and the amount to be repaid on the note was increased. The original monthly installment of $290.74 recited in the deed of trust was not changed to reflect this increase in the amount of the note.

The only real disagreement about the terms relates to the $15,000 note. The Winkles testified that they were to pay interest only on the $15,000 note until their business improved so they could make payments on the principal.

Proof to establish the right of reformation must be clear and decisive. *Williams* v. *Killins,* 256 Ark. 491, 508 S.W. 2d 753; *Goodrum* v. *Merchants and Planters Bank,* 102 Ark. 326, 144 S.W. 198. There is, however, no requirement that the proof be undisputed. *Meeks* v. *Borum,* 240 Ark. 805, 402 S.W. 2d 408. There is a clear preponderance of the evidence to show that the deed of trust as reformed evidences the parties' intent and agreement. Chancery courts have the power to correct mutual mistakes such as this one and under these circumstances it was appropriate that the chancellor exercise this power.

## IV

Appellants argue that the chancellor erred in exempting the loan from the requirements of the federal Truth in Lending Act, 15 U.S.C. § 1601, et seq. Section 1603 (1) of that Act states:

This subchapter does not apply to the following:

(1) Credit transactions involving extensions of credit for business or commercial purposes, or to government or governmental agencies or instrumentalities, or to organizations.

The chancellor found that the loan was "primarily, even

overwhelmingly, for business purposes" and that the bank therefore did not come within the provisions of the Truth in Lending Act. In the opening statement of their brief, appellants say that the net proceeds of the loan, after refinancing of all their outstanding loans, both business and personal, were to be used for purchases in the Winkles' business. Mrs. Phillips testified that the Winkles applied for the loan to pay off two loans by First National Bank of Hot Springs and two loans by appellee, which required approximately $34,000. One of the loans by First National Bank was a Small Business Administration loan. The Grand National loans totaled $5,397.67. The balance of the loan proceeds, after payment of these loans, amounted to $3,989.45, and was deposited into the Winkle Fabric account to purchase inventory. Mrs. Winkle testified that the loan from First National Bank had been used to purchase inventory and fixtures, for building rental and for operation of the business and that the proceeds of both loans were used for business purposes. Although Mrs. Winkle testified that the loans retired at Grand National had been personal loans, she admitted that the proceeds had been deposited in the business bank account and that a part of the proceeds of those loans may have been used for the business. The fact that the Winkles may have drawn checks on this account for personal purposes does not change the nature of the loan at the time it was made. The evidence establishes that the proceeds of the loan were applied primarily to retire business debts and purchase inventory. The chancellor's finding that the loan was exempt is supported by a clear preponderance of the evidence.

V

Appellants contend that the chancellor erred in sustaining appellee's demurrer to their claim for actual and punitive damages. A party seeking damages has the burden of proving the claim; if no proof is presented to the trial court that would enable it to fix damages in dollars and cents, the court cannot award damages. *Mason* v. *Russenberger,* 260 Ark. 561, 542 S.W. 2d 745; *Tolbert* v. *Samuels,* 229 Ark. 676, 317 S.W. 2d 715. Appellants failed to establish any proof upon which a judgment for actual damages could have been based,

even if they had established any right to recover damages. Nor can punitive damages be awarded in the absence of actual damages. *Tolbert* v. *Samuels,* supra. In our view of the case, however, they have not established any right to recover any damages.

## CROSS APPEAL

## I & II

On cross-appeal appellee alleges error in the chancellor's findings that accrual of interest using the "Rule of 78ths" and the use of the rule under the wording of the $22,000 note rendered that note usurious, violating Art. 19, § 13 of the Constitution of Arkansas. The question is whether this note, not usurious on its face or if paid according to its terms, can become a usurious transaction through the use of a mathematical formula, the Rule of 78ths.

The Rule of 78ths is an accounting method of accruing interest and of refunding unearned interest when an installment note is paid before maturity. It approximates the interest accrued by using a system developed on the basis of an installment contract for one year where equal payments are made monthly. The calculation is made on a one year contract by using the number of outstanding payments as the numerator and the total number of payments $(1 + 2 + 3 + 4 + 5 + 6 + 7 + 8 + 9 + 10 + 11 + 12)$ or 78 as the denominator in a fraction then multiplied by the total interest added to the principal to indicate the interest accrued. Thus, 15.38 percent of the total interest to be paid on a one year installment contract, if installments were paid as scheduled, would be considered as having accrued in the first month and 1/78 of 1.28 percent during the twelfth month. For a longer term note, the fraction to be used would be arrived at by using the same method. A series of tests exhibited by appellee reveal that the cross-over point at which the interest calculated as simple interest first exceeds that accruing from application of the Rule of 78ths is near one-third the life of the loan. So, if a borrower voluntarily paid the loan during the first one-third of the term, he would pay more interest than would have been earned on a straight simple interest calculation, but

thereafter, the total interest paid on prepayment would be more nearly equal to that calculated on the conventional simple interest method. The formula was developed to reasonably relate interest earnings to outstanding principal.

The testimony of George Lefler, Executive Vice President of Grand National Bank, described the Rule of 78ths as having nothing to do with calculating interest on a loan, but rather as applying only to prepayment of a loan or the accrual of interest income. Lefler's testimony and the chancellor's findings of fact described the rule's purpose as the acceleration of the payment of interest during the earlier months of the term of an installment note in those cases where the interest for the entire term has been added to the balance of the note.

This note provided that: ''Credit on prepayment of this note shall be computed in accordance with the 'Rule of 78ths', there being no penalty for prepayments.'' Appellee bank, an accrual method taxpayer, contends that because of this provision in the note it had no legal alternative but to accrue and report interest income in accordance with the Rule of 78ths, referring to Treas. Reg. § 1-451-1 (a); Rev. Rul. 72-562, 1972-2 D.B. 231; Rev. Rul. 72-100, 1972-1 C.B. 122. An example contained in Rev. Rul. 72-562, supra, states that if the Rule of 78ths is specified in a contract as the method for determining a prepayment rebate, interest on that installment contract must be accrued in accordance with the Rule of 78ths.

Appellants as borrowers received year-end statements from appellee reflecting the amount the bank had accrued on its books as interest income for that year. The statement received by appellants in January, 1977, read, ''Our records indicate you have paid $2,717.97 interest in 1976 on Account 00418009.'' The account number is the number of the $22,000 installment loan. The bank contends that these statements are informational and do not necessarily reflect the amount of interest actually paid by the debtor, but rather are prepared to reflect the total accrual on a note for the tax year. The chancellor found that interest at 10 percent per annum on this loan would have been $2,496.98 and therefore the

statement sent by the bank reflected interest collected by the bank in excess of 10 percent per annum and that the bank intended to collect interest in excess of 10 percent per annum. We do not consider the Rule of 78ths as it applies to prepayment, there being no question of prepayment in this case.

Certain fundamental rules are adhered to by the courts in determining if usury is present:

1. When usury is alleged, the test is whether the borrower promised to pay a greater rate of interest than the law permits and the lender knowingly entered into a usurious contract intending to profit by the methods employed. *Commercial Credit Plan, Inc.* v. *Chandler,* 218 Ark. 966, 239 S.W. 2d 1009; *General Contract Corp.* v. *Duke,* 223 Ark. 938, 270 S.W. 2d 918; *Blalock* v. *Blalock,* 226 Ark. 75, 288 S.W. 2d 327; *Brown* v. *Central Arkansas Production Credit Ass'n.,* 256 Ark. 804, 510 S.W. 2d 571; *Ragge* v. *Bryan,* 249 Ark. 164, 458 S.W. 2d 403; *Peoples Loan & Inv. Co.* v. *Booth,* 245 Ark. 146, 431 S.W. 2d 472; *Davidson* v. *Commercial Credit Equipment Corp.,* 255 Ark. 127, 499 S.W. 2d 68.

2. The burden is upon one asserting usury to show that the transaction is usurious. *Wallace* v. *Hamilton,* 238 Ark. 406, 382 S.W. 2d 363; *Cox* v. *Darragh Co.,* 227 Ark. 399, 299 S.W. 2d 193; *Key* v. *Worthen Bank & Trust Co.,* 260 Ark. 725, 543 S.W. 2d 496; *Poole* v. *Bates,* 257 Ark. 764, 520 S.W. 2d 273; *Brown* v. *Central Arkansas Production Credit Ass'n.,* supra; *Knox* v. *Goodyear Stores, Inc.,* 252 Ark. 530, 479 S.W. 2d 875; *Nineteen Corp.* v. *Guaranty Financial Corp.,* 246 Ark. 400, 438 S.W. 2d 685; appeal after remand, 250 Ark. 832, 467 S.W. 2d 728; *Geyer* v. *First Arkansas Development Finance Corp.,* 245 Ark. 694, 434 S.W. 2d 301; *Peoples Loan & Inv. Co.* v. *Booth,* 245 Ark. 146, 431 S.W. 2d 472; *McCoy Farms, Inc.* v. *J & M McKee,* 263 Ark. 20, 563 S.W. 2d 409. Because of the highly penal nature of our usury law, the plainest principles of justice require that it be clearly shown that the transaction is usurious. *Arkansas Real Estate Co.* v. *Buhler,* 247 Ark. 582, 447 S.W. 2d 126.

3. In determining whether a contract is usurious it must be viewed as of the time it was entered into and it must be presumed that it will be performed according to its terms. See *General Contract Corp.* v. *Duke,* supra; *Sloan* v. *Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W. 2d 802; *Harris* v. *Guaranty Financial Corp.,* 244 Ark. 218, 424 S.W. 2d 355; *Foster* v. *Universal C.I.T. Corp.,* 231 Ark. 230, 330 S.W. 2d 288, 75 A.L.R. 2d 1260; *Sager* v. *American Investment Co.,* 170 Ark. 568, 280 S.W. 654; *Eldred* v. *Hart,* 87 Ark. 534, 113 S.W. 213; 55 Am. Jur. 331, Usury, § 12; *Hayes* v. *First National Bank of Memphis,* 256 Ark. 328, 507 S.W. 2d 701; *Brown* v. *Central Arkansas Production Credit Ass'n.,* supra; *McCoy Farms, Inc.* v. *J&M McKee,* supra.

4. The actual test of a transaction alleged to be usurious is whether the total amount the borrower will be required to pay is greater than the total amount he could be required to pay to retire the principal indebtedness with interest at 10 percent per annum for the term thereof. *McDougall* v. *Hachmeister,* 184 Ark. 28, 41 S.W. 2d 1088; *Davidson* v. *Commercial Credit Equipment Corp.,* supra.

5. Usury will not be presumed, imputed or inferred where an opposite result can be reached. *Hayes* v. *First National Bank,* supra; *Davidson* v. *Commercial Credit Equipment Corp.,* supra; *Peoples Loan & Investment Co.* v. *Booth,* supra; *Universal C.I.T. Credit Corp.* v. *Hudgens,* 234 Ark. 1127, 356 S.W. 2d 658; *Brittian* v. *McKim,* 204 Ark. 647, 164 S.W. 2d 435; *Brown* v. *Fretz,* 189 Ark. 411, 72 S.W. 2d 765.

Applying these principles, we conclude that the method of accrual used by the bank, the Rule of 78ths, does not render this note usurious. There is nothing in the note itself which reflects any excessive interest charge. Mike Allen, a certified public accountant testifying on behalf of appellants, stated that the note was correct on its face with interest for the term at 10 percent being calculated "right on the button." The chancellor found that if the note had been paid according to its terms, interest would have amounted to ten percent per annum.

The year-end statements sent by the bank were informational only, reporting to the bank's debtors the amount of the bank's annual accrued interest on a loan; the bank was not expecting or demanding payments in accordance with these statements. The statements did not affect or alter the agreement between the parties and the fact that the bank accrued for tax and accounting purposes an amount of interest greater than 10 percent in any year did not affect the debtors' contractual obligation to pay $329.97 per month for a period of 120 months.[1] The reports received by the borrowers reflected the amount of interest the bank was required to accrue on its books and report to the Internal Revenue Service in accordance with IRS requirements and were not statements of appellants' interest obligations under the note. The mere fact that the agreement provided for use of the Rule of 78ths in case of voluntary prepayment by the borrower, even though the agreement stated that there was no prepayment penalty, did not make the note usurious. If the Winkles permitted the note to run until maturity, they would not have paid more than 10 percent per annum in interest, if each installment was paid when due. They could not have been compelled to make any prepayments. They only obligated themselves to pay the installments as they came due, so the contract, as it could have been enforced against them, was not affected with usury. A voluntary prepayment in the exercise of an option given by the contract does not render the contract usurious even though the creditor receives, in the aggregate, a sum more than the principal and the maximum legal rate of interest. *Eldred* v. *Hart,* 87 Ark. 534, 113 S.W. 213. A debtor cannot by making a payment in advance of its due date convert a valid loan into a usurious one. *Green* v. *Mid-State Homes, Inc.,* 245 Ark. 866, 435 S.W. 2d 436. It is our conclusion that the chancellor erred in finding that the use of the Rule of 78ths in the instant transaction rendered the note usurious.

---

[1] The result of adopting the contrary view is illustrated by the chancellor's finding that the bank's statement declaring interest accrued on the loan by the bank in 1975 of $481.18 showed that the bank had charged more than 10 percent interest on the $22,000 note in the year 1975. The chancellor made this finding in spite of his finding that the Winkles made *no payments* on the note in 1975.

## III

It certainly is not at all clear how the credit life insurance became an issue at the trial. If the case had gone to trial only on the pleadings, it might be understandable. But appellants failed to abstract the stipulation entered into by the parties, the pertinent portion of which has been set out earlier in this opinion. The statements referred to in the stipulation simply stated the interest on the two notes during the year 1976 according to the rule of 78ths. Furthermore, the expert witness called by appellees made his calculations including the credit life insurance premium as principal.

We likewise agree that the chancellor erred in finding that the credit life insurance rendered this transaction usurious. The trial court found, as a matter of fact, and it is not denied, that Roger Winkle initialled a change in both the $22,000 and the $15,000 notes to include credit life insurance premiums. The chancery court's holding on the question of usury was based entirely upon the fact that the insurance policy was for $39,596.40 when the amount borrowed was approximately $25,000. The court found that, since there was a violation of Ark. Stat. Ann. § 66-3806 (1) (Repl. 1966), the lender's 35 percent commission on the amount of the policy in excess of the amount borrowed would render the 10 percent note usurious. The note did reflect an advance of $2,969.79 for credit life insurance. George Lefler, Executive Vice-President of Grand National Bank, testified that the insurance premium was paid to World Service Life Insurance Company, an independent insurance company, for the entire 10-year life of the loan, but that the bank reserved a commission of 33 percent to 35 percent. His testimony is not contradicted. The policy issued by World Service Life Insurance Company of Ft. Worth, Texas, was made an exhibit to Lefler's testimony. Its effective date was November 5, 1975. It was for decreasing term life insurance on Janie Winkle. Roger Winkle was contingent beneficiary. The initial amount of insurance was $39,596.40, the face amount of the note, which was arrived at by adding the insurance premium and a 10 percent finance charge of $14,626.61 to the principal amount of $22,000; but the amount of insurance decreased each month by $329.97, the amount of the

scheduled monthly payment, whether the payment was actually made or not. It is true that the policy was not actually issued by an officer of the bank until the physician's report on Mrs. Winkle's physical condition had been delivered to the bank by Roger Winkle, but the effective date was not changed. The testimony of Carolyn Phillips, an assistant vice-president of the bank, was that, if the company refuses a policy, the entire premium is refunded to the customer.

Mrs. Winkle testified that she had, prior to the loan closing, requested credit life insurance and it had been issued on her husband. On the date of the closing they told the loan officer that they wanted the insurance on Mrs. Winkle instead. Mrs. Winkle said that she and her husband thought that *only* a name change would be involved, but that the loan officer then said that she would probably have to take a physical examination. Mrs. Winkle filled out an application, which contained only general questions about her health. She knew at the time that she "was to go back in later on the credit life insurance."

Appellants conceded in the trial court in their response to appellee's motion for rehearing that the only issue with reference to the credit life insurance was whether excess premiums were charged, and, if so, whether they were excess interest, but that the validity of the policy was not in issue. Appellants also stated that they had no objection to the trial court's taking judicial notice that it is the customary practice of all credit life insurance companies, in the event of the death of the insured, to pay any amount of the insurance not needed to satisfy the outstanding balance of the note involved to the secondary beneficiary or the estate of the insured. It was appropriate for the court to take judicial notice because the statute requires this. Ark. Stat. Ann. § 66-3808 (2) (Repl. 1966). Roger Winkle was the contingent beneficiary named in the policy. George Lefler testified that a rebate would be required if the policy were cancelled.

Mrs. Phillips testified that some of the errors in the loan papers were made because the computations had been made before the Winkles requested credit life insurance and this made a recomputation necessary. The note was actually

prepared for the signature of Roger Winkle on a statement that he did not want credit life insurance. Janie Winkle signed a statement that she desired credit life insurance. Just above the place where Mrs. Winkle signed, the following appears: "THE PURCHASE OF CREDIT LIFE, ACCIDENT AND DISABILITY INSURANCE IS NOT REQUIRED FOR CREDIT." Mrs. Phillips said that the credit life policies are automatically accepted by the insurance company, but, if not accepted, the whole premium is refunded to the customer.

Appellants do not allege or contend that there was any fraud, duress or compulsion in connection with the credit life insurance. They agreed to purchase the insurance and knew the amount of the premium at the time. In their opening statement they say:

> *** The loan was signed by the Winkles. Winkles agreed to purchase credit life insurance on Janie Winkle and were informed that no insurance could be written until checking with insurance company as to whether a physical would be required. A disclosure of what the premium would be was placed in the box for agreement to purchase the insurance. A blank application for credit life was filled in by Janie Winkle regarding age, physical condition and just general information. ***

The basic tenets in usury cases material to this case remain unchanged. Some of them are:

1. All reasonable expenses incident to a loan which the borrower agrees to pay or which are paid out by the lender for his benefit are properly a part of the loan proceeds or the amount loaned. *Harris* v. *Guaranty Financial Corp.*, supra; *Lyttle* v. *Mathews Investment Co.*, 193 Ark. 849, 103 S.W. 2d 47; *Brown* v. *Fretz*, supra; *Sidway* v. *Harris*, 66 Ark. 387, 50 S.W. 1002; *Shattuck* v. *Byford*, 62 Ark. 431, 35 S.W. 1107; *Lockhart* v. *GMAC*, 252 Ark. 878, 481 S.W. 2d 350.

2. Insurance premiums paid a third party are proper charges when the borrower agrees to pay them or receives the policy, is not charged an excessive pre-

mium, and receives the benefit of the insurance. *Winston* v. *Personal Finance Co.*, 220 Ark. 580, 249 S.W. 2d 315; *Smith* v. *Eason*, 223 Ark. 747, 268 S.W. 2d 389; *Griffin* v. *Murdock Acceptance Corp.*, 227 Ark. 1018, 303 S.W. 2d 242; *Universal C.I.T. Credit Corp.* v. *Lackey*, 228 Ark. 101, 305 S.W. 2d 858; *Whiddon* v. *Universal C.I.T. Credit Corp.*, 227 Ark. 824, 301 S.W. 2d 567; *Poole* v. *Bates,* supra; *Ragge* v. *Bryan,* supra; *Troxel* v. *Bob Sullivan Chevrolet-Cadillac Co.*, 248 Ark. 1152, 455 S.W. 2d 667.

3. Credit life insurance premiums fall into the same category as other insurance premiums. *Lowrey* v. *General, Contract Corp.*, 228 Ark. 685, 309 S.W. 2d 736; *Universal C.I.T. Credit Corp.* v. *Lackey,* supra.

4. The withholding of sums to meet obligations for insurance premiums with the acquiescence of the borrower does not render the transaction usurious, unless the insurance is a subterfuge. *Hartzo* v. *Wilson*, 205 Ark. 965, 171 S.W. 2d 956; *Ragge* v. *Bryan,* supra.

We have approved the inclusion of credit life premiums as a part of the original indebtedness, even where the lender received a 35 percent commission as agent for the insurance company. In *Poole* v. *Bates,* 257 Ark. 764, 520 S.W. 2d 273, we said:

The principal contention for reversal is based upon the credit life insurance premium. The premium was $55.94, and appellees placed this insurance with an insurance agency; appellees, however, received 35% of the credit life insurance premium as a commission, this amount being in addition to the other moneys under the contract, i.e., the premium was included in the total prior to determining the monthly amount of payments. Accordingly, interest on the commission received by appellees was called for in the monthly payments, and it is appellant's contention that appellees were not entitled to receive interest on that portion of the premium constituting a commission, and since the payments under the contract called for a full 10% interest, that instrument is therefore usurious.

\* \* \* \* \*

\*\*\* [W]e do not agree that the commission here involved, though, as pointed out in the annotation, a factor to be considered, makes this particular contract usurious. In the first place, this is not a case where the purchaser was compelled to purchase insurance before appellees would finance the purchase of the car; i.e., it was not a charge made for the purpose of allowing them more interest. Rather, it appears that appellant requested this insurance. In the next place, there is no contention that the insurance charge was excessive. In other words, it was a *bona fide* transaction. The charge for insurance was paid and appellant received the benefit requested. The rebate itself was not illegal, nor is there any reason, since appellant asked for the insurance and received exactly what he requested, why such should be illegal. After all, there could be no difference to appellant in purchasing the insurance through appellees, and purchasing it from some company across the street or elsewhere, i.e., there is no showing that the premium would have been less. So long as there is no element of fraud, nor duress or compulsion upon the borrower to take the insurance from the lender, we see no reason why the automobile agent is not as entitled to represent the insurance company, and accordingly receive a commission, as anyone else. In other words, no *unlawful* charge or profit is involved.

The facts in this case take it outside the reach of those cases in which it has been held that credit life insurance premiums or commissions paid to a lender for insurance are to be considered as interest. The premium was paid by the bank to the credit life insurance company in advance. The bank was contractually bound to furnish credit life insurance. The borrower was not compelled to purchase credit life insurance before the bank would make the loan. The borrower was not fraudulently induced to take the insurance. Appellants requested the insurance. There is no evidence to even hint that any of the parties were not acting in good faith. Appellants received the benefit of the insurance. There is no contention that the insurance premium charged was excessive except for the issue as to the amount of the coverage, and there is no showing that the insurance could

have been purchased at a lesser premium. The Winkles had carried credit life insurance on previous loans. The policy was issued effective November 5, 1975, the date of the loan. The issue then turns upon the application of Ark. Stat. Ann. § 66-3806 (1) (Repl. 1966).

The chancellor found that Ark. Stat. Ann. § 66-3806 (1) was violated because "the maximum amount which could have ever been paid under the policy would be something in the neighborhood of $25,000." That statement does not demonstrate a violation of the statute which provides: "The amount of credit life insurance shall not exceed the original amount of indebtedness." The original amount of indebtedness was the face amount of the policy and the note — $39,596.40. If the word "indebtedness" had not been defined in the same act of which § 66-3806 (1) is a part, it might be argued persuasively, but not conclusively, that the chancellor applied the statute properly. The word "indebtedness," as defined by Ark. Stat. Ann. § 66-3804 (5), however, includes "the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction." The total amount payable by the Winkles on the effective date of the policy to the bank on this credit transaction, if the note had been paid according to its terms, was $39,596.40. By the terms of the note, the Winkles promised "to pay to the order of Grand National Bank (herein called Bank), at its office in Hot Springs, Arkansas, the sum of Thirty-four Thousand Eight Hundred-Eight and 80.100 Dollars,[2] in 120 installment[s] of $329.97 beginning December 20, 1975, and on the same date each month thereafter until paid in full . . ."

The decree is affirmed on direct appeal and reversed on cross-appeal. The cause is remanded to the trial court for the entry of a decree and for further proceedings consistent with this opinion.

GEORGE ROSE SMITH, J., concurs.

HICKMAN, J., concurs in the result.

---

[2]This was one of the errors in the preparation of the note and in the upper left-hand corner the amount is correctly stated as $39,596.40.

Purtle, J., dissents.

George Rose Smith, Justice, concurring. I agree that the Rule of 78ths is valid, simply because an otherwise lawful promissory note is not rendered usurious by a provision requiring the debtor to pay a premium for the privilege of paying the principal debt in advance of its due date. That issue is purely one of law, presented in this case upon undisputed facts. But the majority opinion, by applying to this question of law certain presumptions that are properly applicable only to questions of fact, goes so far astray that I am compelled to make this effort to set the record straight.

Our Constitution, written more than a hundred years ago, provides that contracts for more than 10% interest are void as to principal and interest. Constitution of 1874, Art. 19, § 13. That penalty is so severe that in an early case, turning solely upon an issue of fact, we held that the debtor had the burden of clearly showing that the note in question was usurious. *Leonhard* v. *Flood,* 68 Ark. 162, 56 S.W. 781 (1900). There we said:

> Our law visits on a lender who contracts for usurious interest, however small, a forfeiture of his entire loan and the interests thereon. It follows from the plainest principles of justice that such a defense should be clearly shown before the forfeiture is declared. For this reason, usury will not be inferred where, from the circumstances the opposite conclusion can be reasonably and fairly reached.

Thus the rule of clear and convincing evidence in usury cases was born, though it has had its ups and downs. That is, in some later cases we have specifically said that a preponderance of the evidence is all that is needed to sustain a plea of usury. *Tisdale* v. *Tankersley,* 192 Ark. 70, 90 S.W. 2d 225 (1936); *Dickinson-Reed-Randerson Co.* v. *Stroupe,* 169 Ark. 277, 275 S.W. 520 (1925). Thus we actually have two inconsistent lines of cases. Even so, I have no quarrel with the clear and convincing rule in its proper place, which I take to be the situation in which the debtor seeks to contradict the terms of his written obligation. Thus if the debtor signs a

$500 note, bearing 10% interest, he may fairly be required to show by clear and decisive testimony that he received only $450.

The corollary presumptions against usury with regard to questions of fact have no reasonable application to questions of law. Here the intent of the Constitution cannot be misunderstood: Any attempt by a lender to extort more than 10% interest is so strongly and unequivocally condemned that he forfeits his entire principal as well as his usurious interest. Thus there is no basis whatever for taking the position, as the present majority opinion seems to do, that excessive interest is somehow a favorite of the law, to be zealously protected by the courts.

By and large, this court has discharged its duty to uphold the Constitution. We did hold, in an early case, that it was not usury for a seller to fix a credit price that was in excess of the cash price plus legal interest. *Ford* v. *Hancock,* 36 Ark. 248 (1880). Regardless of the merits of that decision, we later faltered badly be permitting its doctrine to be used as a subterfuge allowing finance companies to charge excessive interest in what were really sales for a cash price.

Our failure to give effect to the spirit of the Constitution came to a sudden halt with the landmark decision in *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W. 2d 973 (1952). There we overruled many decisions and effectively put a stop to the use of installment sales as a cloak for usury. There quickly followed a series of decisions that were hammer blows nailing down our position. We rejected a retailer's attempt to use a credit sale as a means of exacting excessive interest, even though no finance company was involved. *Sloan* v. *Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W. 2d 802 (1957). We required lenders, in writing contracts, to put down in black and white a clear statement of every charge that was being added to the principal and to shoulder the burden of proving that meaningless labels were not concealing usury. *Jones* v. *Jones,* 227 Ark. 836, 301 S.W. 2d 737 (1957). We rejected an unsophisticated lender's testimony that he did not really mean to charge more than 10%, warning lenders that they must at their peril familiarize

themselves with the law. *Brooks* v. *Burgess,* 228 Ark. 150, 306 S.W. 2d 104 (1957). Many other cases might be cited to confirm the position we have steadfastly adhered to since the *Hare* case, that the Constitution means what it says.

Finally, it may be observed in passing that our constitutional ceiling on interest rates is not fundamentally or necessarily bad. The men who wrote the Constitution may have believed in 1874, and might believe today, that high interest rates not only are inflationary but also are a means by which the rich have oppressed the poor since as long ago as Biblical times. That our constitutional ceiling is under fire today results not so much from any inherent defect in the ceiling but from the fact that the other 49 states have no equally low limitation upon interest rates. Until the people change the Constitution, however, our plain duty is to enforce it.

John I. Purtle, Justice, dissenting. I am compelled to dissent in this case. I agree with the concurring opinion the proper rule is that clear and convincing evidence is required before a contract will be voided upon the grounds of usury. I agree that this rule has had its ups and downs. Today it is down. I further agree that we have at least two lines of inconsistent cases in matters pertaining to usury. After this opinion, you can add another line. There is no question that both the majority and concurring opinion correctly state the rules and laws as they pertain to usury. However, from that point on, I am in considerable disagreement with the majority.

"Usury" was the term originally applied to charges made for the use of money. Any amount repaid in excess of that borrowed was considered usury. This term goes back to at least Biblical times. After the Israelites were returned from captivity, they were allowed to charge Canaanites usury as a means of ruling them. However, Nehemiah, a prophet and governor of Jerusalem in 444 B.C., forbade the charging of usury (interest). Nehemiah 5:7-11. Historically, the various churches taught that charging of interest was sinful; nevertheless, successful merchants and commercial entrepreneurs continued the practice.

An ordinance was passed in London in 1363 which outlawed usury (interest). In 1545 England passed a law

repealing the 1363 ordinance and allowed usury at the rate of 10%. This 1545 law was repealed in 1551 by a statute that specifically declared usury to be prohibited by the word of God. W. Holdsworth, *History of the English Law,* vol. viii, at 100-112 (1926).

Usury, as we know it, is opposed in Arkansas by strong public policy as declared by the constitution and the General Assembly. However, interest has not been considered against public policy. Usury or interest is controlled by law in practically every country in the world. In fact, it was controlled in Arkansas prior to the Constitution of 1874. Rev. Stats. of Ark., ch. 80, § 112, at 469 (1937).

It is impossible for me to study our prior cases and ascertain a clear definition of what constitutes usury in Arkansas. For example, we have held a contract where a lender attempted to receive more than the amount allowed by law from the borrower is usurious. *Home Building & Savings Association* v. *Shotwell,* 183 Ark. 750, 38 S.W. 2d 552 (1931). We have also held if the lender, by mistake of fact or error in calculation, contracts to receive an illegal rate of interest, the contract is not void. *Garvin* v. *Linton,* 62 Ark. 370, 35 S.W. 430 (1896). In *Garvin* excessive interest was reserved through mistake of fact on the part of the lender only, and the excess was held not to be recoverable. Once again, we held that reservation of excessive interest through mistake of fact on the part of the lender did not render the contract usurious in *Aldrich* v. *McClay,* 75 Ark. 387, 87 S.W. 813 (1905). To the same effect, see: *Temple* v. *Hamilton,* 178 Ark. 355, 11 S.W. 2d 465 (1928). In *Mitchell* v. *Duncan,* 190 Ark. 598, 79 S.W. 2d 997 (1935), we held that the wrongful demand of excessive interest did not constitute usury because there was no agreement to pay the excessive demand. Compare this case with *Redbarn Chemicals, Inc.* v. *Bradshaw,* 254 Ark. 557, 494 S.W. 2d 720 (1973), where we held the attempt to collect 1% per month finance charge rendered the contract usurious.

We have held a contract to pay interest greater than 10% per annum renders a contract absolutely void as to principal and interest. *Smith* v. *Eason,* 223 Ark. 747, 268 S.W. 2d 389

(1954). In one very early case, we held that a note bearing 10% interest given to cover supplies and money to be furnished did not render the contract usurious even though there was a failure to furnish a part of the supplies which was given as consideration for the contract. *Lanier* v. *Union Mortgage, Banking & Trust Co.,* 64 Ark. 39, 40 S.W. 466 (1897).

In the case of *First National Bank of Memphis* v. *Thompson,* 249 Ark. 972, 463 S.W. 2d 87 (1971), we held that an error in mathematical calculations resulting from a mistake of law could not be forgiven and could not remove the taint of usury. To the same effect, we have held an error in calculation was not one to be forgiven where the error involved the wrong interest rate. *Ford Motor Credit Co.* v. *Catalani,* 238 Ark. 561, 383 S.W. 2d 99 (1964). However, see *Davidson* v. *Commercial Credit Equipment Corp.,* 255 Ark. 127, 499 S.W. 2d 68 (1973), where we held an error in calculating interest on a mortgage was forgiveable as an act done in good faith. We held in *Davidson* there was no usury.

It seems to me that we are back to "square one"; and, we should make a new beginning as we attempted to do in *Hare* v. *General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W. 2d 973 (1952).

I cannot agree with either the majority or the concurring opinion in matters relating to the Rule of 78ths. The majority seems to believe that the Rule of 78ths is limited to prepayment penalties. The opinion states the Rule of 78ths is an accounting method of accruing interest and of refunding unearned interest by prepayment. I do not understand the Rule of 78ths to be so simple. In fact, the majority clearly states a 10% note paid pursuant to Rule of 78ths would bear interest for the first month, on a one-year contract, at the rate of 15.38% per annum. Actually, the Rule of 78ths requires payment in excess of 10% about the first third of the life of the loan. Thus, the first 10 years of a 30-year loan would bear interest at a rate considerably greater than 10% per annum.

What does the constitution have to say about usury? Although not set out verbatim in either the majority or con-

curring opinion, Art. 19, § 13, Constitution of Arkansas 1874, states:

> All contracts for a greater rate of interest than 10% shall be void, as to principal and interest and the General Assembly shall prohibit the same by law; but when no rate of interest is agreed upon, the rate shall be 6% per annum.

There is no need to spend any time proving the Rule of 78ths violates the plain words of the constitution when the rule is applied to the first year of a 10-year loan such as we have in the case before us.

In the past we have allowed the interest to be calculated over the life of the contract; and, if overall the interest did not exceed 10%, we held such contract did not violate the prohibition against usury. *McDougall* v. *Hachmeister,* 184 Ark. 28, 41 S.W. 2d 1088 (1931). On the other hand, we have held if interest on a contract charged up to the time of the filing of the suit to void the contract exceeded 10% per annum, it was violative of the prohibition against usury. *Ryder Truck Rental* v. *Kramer,* 263 Ark. 169, 563 S.W. 2d 451 (1978).

The Rule of 78ths is designed for collection of the note over the life of the contract and not merely for early prepayment penalty as seems to have been suggested by the majority and concurring opinions. In the event of default, it is always the outstanding balance which is sued for, plus attorneys' fees, abstracting costs, and so on. No credit is allowed for excess interest already paid. In the present case it is admitted that the lender charged about 15% interest on this $22,000 note during the calendar year 1976.

The Rule of 78ths admittedly recognizes accumulation of interest at a rate greater than direct application of the simple interest rates. In a simple interest case, the annual percentage rate is calculated on the actual amount borrowed; whereas, under the Rule of 78ths, or ''sum of digits'' method, takes into consideration the cost of putting the loan on the books and assures the lender of collecting extra interest, above 10%, in the event of an early payment of the loan.

Using the annual percentage rate of the Rule of 78ths, larger amounts of interest are collected in the earlier stages of the loan. The Rule of 78ths simply collects more than the annual rate during the first third of the contract and collects less during the last two-thirds of the contract. The net amount paid by the borrower, if paid on schedule, is exactly the same.

An example of the two methods of collecting interest is illustrated in the present case. Interest charged on the $22,-000 note for the calendar year 1976, using the sum of digits method, was $2,717.97. Had the interest on the same note been figured at 10% per annum, simple interest would have amounted to $2,496.98, the exact amount found by the chancellor to have been collected by the lender.

If there were no prepayment in this case, and certainly there was not, the appellants were required to pay a rate in excess of 10% per annum for the year 1976. Considering this fact, we should state clearly that we will consider the interest charged over the life of the contract to be the controlling factor. Failing to do this, we should issue a caveat that all contracts employing the Rule of 78ths will be declared void as usurious that are entered into after the date of this opinion.

It is obvious the rate of interest has always been considered a matter of public concern. The wisdom of such a policy was never clearer than it is at this time. With interest running at the rate of 20% and still climbing, the present situation compels one to ponder whether our society can continue to exist as it has in the past. In past decisions we have made reference to Arkansas being a capital starved state. We have also made reference to interest rates driving industry from the state, depriving citizens of jobs, preventing consumers from purchasing necessary goods and supplies, and relating factors to be considered in matters of the rate of interest. All of these preceding factors are matters to be weighed by the people of Arkansas if and when a change in the rate of interest is authorized. Meanwhile, this Court should hold that all contracts in violation of the plain words of the constitution are usurious.

Appellants argued the note should have been cancelled

because of appellee's fraudulent and material alterations to the instrument. In doing so, they rely upon Ark. Stat. Ann. § 85-3-407 (Add. 1961) which is accurately quoted at page 8 of the majority opinion. This contract was changed so many times by the appellee that it could hardly be recognized as the contract the parties signed. For example, the monthly installments were listed on the original note as $290.74 and were changed by the bank to read $329.97. This is only one of several changes which the appellants argue violated the above statute.

One of the loans was for $22,000. The bank added $2969.74 as insurance premium and $14,626.61 as interest which brought the total note to $39,596.40. The bank received 35% of the insurance premium as a commission for selling the insurance. This commission was never paid to the insurance company. Ark. Stat. Ann. § 66-3806 (Repl. 1966) states that credit life insurance shall not exceed the original amount of the indebtedness. In my opinion, the original amount of the indebtedness was $22,000. Therefore, insurance covering the total amount, which would have been paid over the life of the contract ($39,596.40), does not represent the amount of the original indebtedness. At no time would the appellants have ever owed this amount. In fact, the most they could have owed at any one time was $22,000 plus the insurance premium and accrued interest.

At any rate, the insurance policy, if issued at all, was not issued until sometime after the loan was made. The bank and the insurance company required Mrs. Winkle to obtain a physical examination before they would insure her. Obviously, if she had died prior to the furnishing of this information, there would have been no proceeds payable because no policy existed. The fact that the policy, if issued, was backdated is merely a contraption to claim the entire premium was earned.

, In *Strickler* v. *State Auto Finance Co.,* 220 Ark. 565, 249 S.W. 2d 307 (1952), we held the imposition of charges for premiums on insurance policies in addition to the 10% by the lender on the borrower was usurious. See also *Jones* v. *Jones,* 227 Ark. 836, 301 S.W. 2d 737 (1957).

For the above reasons I would not grant a rehearing in this case and would uphold the original opinion handed down on November 13, 1979.